664 P.2d 947 (1983)
In the Matter of SEVEN MINORS.
THOMAS R., a Minor, Appellant,
v.
JUVENILE DIVISION, EIGHTH JUDICIAL DISTRICT COURT OF the STATE of Nevada In and For the COUNTY OF CLARK, Respondent.
MICHAEL S., a Minor, Appellant,
v.
The STATE of Nevada, Respondent.
TERRY M., a Minor, Appellant,
v.
The STATE of Nevada, Respondent.
BRETT G., a Minor, Appellant,
v.
The STATE of Nevada, Respondent.
PARRIS W., a Minor, Appellant,
v.
The STATE of Nevada, Respondent.
SANDRA C., a Minor, Appellant,
v.
The STATE of Nevada, Respondent.
AMANDA C., a Minor, Appellant,
v.
The STATE of Nevada, Respondent.
Nos. 12966, 13296, 13483, 13488, 13494, 13679 and 13819.
Supreme Court of Nevada.
June 9, 1983.
*949 Morgan D. Harris, Public Defender, Victor John Austin, Deputy Public Defender, Las Vegas, for appellants.
D. Brian McKay, Atty. Gen., Carson City, Robert J. Miller, Dist. Atty., James Tufteland, Deputy Dist. Atty., Las Vegas, for respondent.

OPINION
SPRINGER, Justice:
The subject matter of these appeals is the practice of transferring certain serious juvenile offenders out of the juvenile division for criminal prosecution in district court. NRS 62.080[1] authorizes the juvenile court to certify[2] for adult criminal proceedings 16 and 17 year old juveniles chargeable with felony offenses. These appeals, presented by juveniles facing adult criminal prosecutions, give us occasion to examine an important and critical aspect of juvenile court law and to establish certain procedural and substantive standards for the guidance of juvenile courts in dealing with these matters.
Transfer has played an important role in juvenile court jurisprudence since its earliest days and has acted as a safety valve through which offenders who were within the statutory age of juvenile court jurisdiction could in appropriate circumstances be held accountable for their criminal acts by referral to the adult criminal justice system.
The transfer process is based upon the sound idea that there is no arbitrary age at which all youths should be held fully responsible as adults for their criminal acts and that there should be a transition period during which an offender may or may not be held criminally liable, depending on the nature of the offender and the offense.[3]
Other than the requirement of a "full investigation" the statute places no limitations on the discretion of the juvenile courts in such matters. The latitude of this discretion has been limited in some degree by our opinion in Lewis v. State, 86 Nev. 889, 478 P.2d 168 (1970), wherein we adopted the so-called Kent[4] criteria to be followed by juvenile courts in transfer matters.
Although the Kent criteria give some guidance to judges making transfer decisions, our adoption of these criteria in Lewis still did not provide a definitive, substantive *950 rule to be applied in transfer proceedings.[5]
It is the office of this opinion, building on the Juvenile Court Act and on Kent and Lewis, to construct an understandable and usable transfer rule to be applied by juvenile court judges in making transfer decisions. We start with the Juvenile Court Act.
The Juvenile Court Act requires that juvenile courts function in a manner which is conducive to the child's welfare and to the best interests of the state. NRS 62.031(1).
Juvenile courts have traditionally been preoccupied with the interests of the child, and the interests of the state, as such, did not become a declared, joint purpose of our Juvenile Court Act until 1949.
The juvenile court from its inception in Illinois in 1899 until approximately the middle of this century was a child-centered institution based on theories taken from the positive school of criminology and especially on the deterministic principle that youthful law violators are not morally or criminally responsible for their behavior but, rather, are victims of their environment  an environment which can be ameliorated and modified much in the way that a physician modifies the milieu interieur of a sick patient.
Under such a doctrine the juvenile court tended to lose its identity as a court and became more of a social clinic than a court of law. Lost to such an institution was the moralizing and socializing influence associated with the operation of criminal courts; and, more importantly, lost too were society's ageless responses to criminal behavior: punishment, deterrence, retribution and segregation. So it was that juvenile courts in Nevada prior to 1949 were not charged with administering the criminal law for the protection of society against juvenile criminality but were required to treat the youthful law violator "not as a criminal, but as misdirected, and misguided and needing aid, encouragement and assistance." NCL § 1032.
This kind of kindly, paternalistic approach was eventually seen as being ill-suited to the task of dealing with juvenile crime. The legislative response to this realization was that toward the middle of this century a number of state legislatures, including our own, made changes in the purpose clause of juvenile court acts so that juvenile courts were required to consider the public interest as well as the child's interest. This departure from traditional juvenile justice philosophy is significant. We take it to indicate that the status of juvenile courts as courts is to be recognized and that protection of the public against juvenile criminal offenders may be effected by invocation of the means traditionally employed in the judicial administration of the criminal law. Juvenile courts may under such legislative direction properly consider the punitive, deterrent and other accepted adjuncts of the criminal law.
Although juvenile courts may have difficulty at times in balancing the interests of the child and the public, there is no irreconcilable opposition between the two. By formally recognizing the legitimacy of punitive and deterrent sanctions for criminal offenses juvenile courts will be properly and somewhat belatedly expressing society's firm disapproval of juvenile crime and will be clearly issuing a threat of punishment for criminal acts to the juvenile population.
Juvenile delinquents are brought before the court for committing crimes. They should be made to recognize that they have done something wrong and be prepared to accept unpleasant consequences together with the treatment and rehabilitation normally forthcoming in juvenile court proceedings. The two are related, and punishment has in many cases a rehabilitative *951 effect on the child and consequently will serve the child's best interests as well as the state's.
Enforcing the state's interests in a manner designed to hold juveniles responsible for their violations of the criminal laws need not by any means dilute the strength of educative and rehabilitative measures properly taken by the juvenile courts in attempting to socialize and civilize errant youth. Guidance, understanding and care still have the same place in juvenile court proceedings. Even youths who commit more serious crimes can profit from a separation from adult offenders and from the special treatment and special programs which are available in juvenile courts; this does not mean that they should go unpunished.
While juvenile courts must balance these sometimes conflicting interests, the court's duty to the public is paramount. The primary purpose of juvenile court intervention in delinquency cases is social control; and when one interest must predominate, it should be that of the public.
Generally speaking, in the juvenile court's weighing of the treatment and rehabilitative aspects of the juvenile process against the public protection aspects (accountability, punishment, deterrence and the like), the less serious and repetitive the criminal acts and the younger and more immature the child, the more can parens patriae be invoked for the care, rehabilitation and advancement of the best interest of the child. By the same token, the older and more mature the child and the more serious and repetitive the offenses, the more emphasis must be placed on public protection. We reach the extreme of this spectrum when we come to the matter of transfer. Here we have an all-or-none situation, one in which the basic decision is whether the public interest and safety will permit the youth before the court to be treated as a child. The public interest and safety require that some youths be held accountable as adults for their criminal misconduct and be subjected to controls, punishment, deterrence and retribution found only in the adult criminal justice system. This is the reason for transfer.
Once transfer is justified on the basis of public interest and safety, there is no need to consider the "best interests of the child" or the youth's amenability to treatment in the juvenile court system except insofar as such considerations bear on the public interest. Once in a given case transfer is decided upon on this basis, the youth is no longer presumed to be a child in the eyes of the law and no longer entitled to the grace provided by the Juvenile Court Act in that particular case. Accordingly, the juvenile court need not consider the youth's best interests (and comfort) as such; although, in weighing the public necessity for transfer, the court may consider, for example, that the probability of a given youth's becoming a productive and law abiding citizen is much greater under juvenile court cognizance and that retention in the juvenile system may therefore be more in the long-term public interest than would be transfer for adult prosecution. As mentioned below, such subjective factors may be properly considered in determining which youths should not be transferred to adult court in those cases where the public interest does not clearly demand transfer.
Adoption of a rule for transfer based primarily on public safety interests is not in harmony with the rules commonly seen in operation throughout the juvenile justice system. As a general rule when substantive standards for transfer have been articulated either legislatively or judicially, they have been based on what was best for the child and on whether the youth subject to transfer proceedings appeared to be "unlikely to benefit from any disposition available to the juvenile court."[6] Under this view a youth who can establish a likelihood of benefit from juvenile court handling is immunized from transfer no matter how *952 serious the crime committed or how extensive past criminal behavior has been. This is totally unacceptable.
With community protection as the guiding principle to be considered in transfer proceedings, subjective evaluations and prognostications as to whether a given youth is or is not likely to respond favorably to juvenile court treatment will no longer be the court's primary focus in transfer proceedings; rather, the dispositive question to be addressed by the court is whether the public interest requires that the youth be placed within the jurisdiction of the adult criminal courts. The juvenile court must make a rational discrimination, based upon the best interests of the state, between youths who should properly be kept in the juvenile court system and youths who should be sent to adult court.
With public protection established as the general controlling principle upon which the transfer decision is to be based, we are able to formulate guidelines to be applied by the transfer decision maker. The Kent memorandum mentions two specific factors which should be taken into account, namely, whether the charged offense is of a heinous or aggravated character and whether there has been a pattern of repeated past offenses. These two factors together with a third, the personal qualities and background of the offender, are the factors ordinarily considered by a sentencing judge in a criminal case; they are also the factors which should be considered in determining whether or not the public interest requires that a particular youth be transferred to adult court. In transfer matters, then, we hold that the juvenile court should consider a decisional matrix comprised of the following three categories: first, nature and seriousness of the charged offense or offenses; second, persistency and seriousness of past adjudicated or admitted criminal offenses; and third, what we will refer to as the subjective factors, namely, such personal factors as age, maturity, character, personality and family relationships and controls.
As in the sentencing process, primary and most weighty consideration will be given to the first two of these categories.[7] By focusing on the youth's criminal activity, past and present, the court is in a better position to make objective judgments in differentiating between the hardcore offender and the majority of 16 and 17 year old youths who do not, in the public interest, necessarily have to suffer the consequences of adult prosecution. By stressing objective records rather than subjective clinical factors, the court will be adopting much safer and fairer criteria for transfer decisions.
It follows, then, that the transfer decision may be based on either or both of the first two categories. For example, the nature and seriousness of the crime upon which the transfer proceedings are based may be such that transfer should be based on this factor alone. Only the most heinous and egregious offenses would fall into this category, however. Similarly, a persistent record of past serious offenses may alone justify transfer even if the supporting, present charge were of relatively less seriousness.
The third category, the subjective factors, must be considered with greater caution; and transfer should not be based on this category alone. For example, a judge's conclusion that the youth in court is relatively sophisticated, uncontrite or rebellious does not justify a decision to transfer, absent a finding that one or both of the first two categories call for adult treatment. This third category, involving subjective evaluation of the youth, will come into play principally in close cases in which neither of the other two categories clearly impels transfer to adult court. In such cases, even given fairly serious criminal activity, a decision not to transfer may be properly and *953 wisely made because such individual considerations as mental attitude, maturity level, emotional stability, family support and positive psychological and social evaluation require a finding that the public interest and safety are best served by retaining the youth in the juvenile system.
Once punishment and deterrence are accepted as standard fare on the juvenile court menu, there should be a greater tendency to retain youths in the juvenile system rather than to send them off to the dire consequences of the adult system. Juvenile courts should be able to fashion reasonable punitive sanctions as part of dispositional programs in delinquency cases.[8] Such programs can provide acceptable levels of punishment and personal accountability for the offender and provide protection to the community in such a manner that it will not be necessary in most cases to consider having to resort to the adult criminal justice system. This might very well not be the case if the juvenile court were restricted to non-punitive types of rehabilitative and therapeutic measures alone. Premature transfer to adult court of young and immature youths would frequently be contrary to the interests of society, as well as being contrary to the interests of the youth. The harsher treatment and association with hardened criminals may increase the incipient criminal tendencies of the youthful offender. Another consideration militating against premature transfer is the nullification process whereby transferred youths may avoid punishment altogether by reason of a sentencing judge's understandable reluctance to commit a 16 or 17 year old to the miseries of an adult prison.

Procedural Considerations
To complete the elaboration of a community safety standard applicable in transfer proceedings it is necessary to deal with two procedural considerations, namely, burden of proof and prosecutive merit.
The legislature has set the upper limit of original juvenile court jurisdiction at age 18. Persons under 18 years of age are presumed to come within the jurisdiction of the juvenile court; they should not be transferred from the juvenile court to adult court unless it is made to appear clearly and convincingly that the public safety and welfare require transfer.
"Prosecutive merit" is a term referring to the necessity for establishing the merit of the prosecution's case as a condition for proceeding with the transfer process. According to the Kent memorandum, prosecutive merit exists if there is evidence upon which a grand jury would be expected to return an indictment. To say that there is prosecutive merit is to say that there is probable cause to believe that the subject minor committed the charged crime.
Judicial economy requires that a preliminary determination be made as to the prosecutive merit of the charge before going ahead with the transfer process. If there is no prima facie case to support the charge, there is no point in the court's involving itself further in the process. Thus, the only reasonable way to proceed is for the court to make an initial determination of prosecutive merit. Unless probable cause is conceded by the minor, the court should proceed to hear and determine this issue before proceeding further.

*954 The Transfer Cases

A. Thomas R. (Case No. 12966)
Thomas R. was 17 years old at the time of his certification hearing. He was charged with residential burglary.
The minor has a number of previous felony offenses. In November, 1975 when he was only ten years old, he was adjudicated a delinquent on felony charges of burglary and arson. On February 2, 1977, he was adjudicated a delinquent on a burglary charge.
The minor's record of past adjudicated offenses is of the kind that would support transfer; however, we note that in making the decision to transfer Thomas the juvenile judge also considered past offenses which were neither admitted by the juvenile nor adjudicated as delinquencies.[9] This is error. See Marvin v. State, 95 Nev. 836, 603 P.2d 1056 (1979) (requiring reliance upon "accurate and reliable information."). To be considered by the court past offenses should be either adjudicated or properly admitted by the youth.
The question, then, is whether, absent the improperly considered criminal offenses, there is still support in the record for the transfer decision. When the seriousness of the present offense, residential burglary, is viewed in conjunction with the previous felony delinquency adjudications, a quantum of culpability is reached which precludes appellate interference in the juvenile judge's decision.
We consider burglary to be a very serious crime. Intentional and trespassory invasion of the home of another, especially in the nighttime, can arguably be considered as a form of violence. It is an offense which conduces towards violence and may cause serious and permanent psychological harm to the victim. It is the type of crime which may, when considered with other factors, justify the imposition of the punitive and deterrent consequences found only in the adult criminal justice system.
In examining the third category, the personal attributes of this youth, we find no cause to question the trial judge's decision. Although he was only 16 years old at the time of the charged burglary, the record shows that the minor has spent time in the restrictive environment of the Spring Mountain Youth Camp, apparently to no avail. The record further shows an admission by the youth that he discharged a firearm during the previous burglary. There is nothing that we can find concerning the personal character and attributes of this youth which would cast any doubt on the juvenile judge's decision to transfer. The juvenile judge did not abuse his discretion in ordering the transfer, and his decision is, in our opinion, supported by clear and convincing evidence. We affirm.

B. Michael S. (Case No. 13296)
Michael is charged with participating in two residential burglaries which occurred on the same day. He was 17 years old at the time the charged offense was committed; he was 18 at the time of his hearing. Michael's past record is that in June, 1979 he and a companion stole two bicycles.
The primary factors discussed above, seriousness of the charged offense and past record, are not of such weight in this instance as to require the invocation of the heavy sanctions available in the adult criminal justice system. We have here a boy who had previously stolen a couple of bicycles and who was involved with three other youths in the daytime burglary of two homes.
Although burglary is a serious crime which can, when combined with other factors, support a transfer decision, we do not think the charges in this case support a decision which calls for adult prosecution and possible prison sentence. We most certainly are neither diminishing the seriousness of the charges nor suggesting that this minor should not be punished for his criminality. We say only that this case does not rise to the level or degree that calls for *955 removal to the adult system. This 17 year old minor can be and should be punished, but this may be accomplished in the juvenile court system.
There is evidence in the record that Michael's mother, a policewoman, and his stepfather are supportive of him and that his problem seems to turn around the use of marijuana and "peer pressure." The subjective category appears to weigh in favor of Michael's retention in juvenile court.
The interests of the state and the interests of the child will be best served by Michael's retention in the juvenile court. A one-time bicycle thief charged with burglary need not be sent off to the adult criminal justice system. The transfer order will be reversed.

C. Terry M. (Case No. 13483)
This 17 year old juvenile appeared on a petition for transfer on a charge of residential burglary. He was found hiding in the burglarized victim's house, and there appears to be little question concerning his complicity in the charged offense. Although we agree with appellant that the mere filing of a juvenile petition by the district attorney would not by itself support a challenged finding of prosecutive merit, there is in the present record sufficient unchallenged evidence of the youth's complicity in the charged burglary to support the juvenile court judge's finding of prosecutive merit, and we will not set it aside.
This youth's record shows that he is a persistent offender. In 1977 he was adjudicated to be a delinquent child by reason of his having committed the offense of possession of stolen property. In January, 1978, Terry was committed to the Nevada Youth Training Center following adjudication of delinquency on two counts of burglary and one count of possession of a controlled substance.
Concerning the personal attributes of the youth, it is interesting to note that the record contains a qualified professional opinion of the Superintendent of the Nevada Youth Training Center that this young man is immature and would benefit from further treatment as a juvenile in juvenile court. As indicated above, we do not accept amenability to juvenile court treatment as immunizing a youth from adult transfer, and we adopt a much more objective standard which looks primarily to what the youth has done rather than to subjective evaluation as to present character or future potential.
There is clear and convincing evidence to support the transfer; we affirm.

D. Brett G. (Case No. 13488)
This case presents very little difficulty. Brett G., 17 years of age, is accused of two residential burglaries. A finding of prosecutive merit will be upheld for the same reasons stated in the case of Terry M. He was adjudicated a delinquent twice in 1977 for burglary. He has been institutionalized for juvenile offenses. He is a heavy drug user, and little or no case is made for his retention in juvenile court. The case is clear and convincing, the transfer is affirmed.

E. Parris W. (Case No. 13494)
This case is similar to that of Michael S. Parris, a 17 year old, has a previous adjudicated delinquency, possession of stolen property, and is presently charged with residential burglary. The case of Parris differs from Michael in that Parris was on probation at the time of the alleged commission of the residential burglaries. This certainly is indicative of incorrigibility and persistency on the minor's part and favors the transfer decision; however, the previous charge of possession of stolen property does not seem to be of great consequence, and it does not appear clear and convincing to us that the combination of this and the present charge rise to the degree of culpability which would require adult treatment in order to afford proper protection to the community.
There are a number of other considerations in this case. It is obvious from the record that the juvenile judge was strongly and improperly influenced by a number of previous arrests and referrals as opposed to felony delinquency adjudications or admissions.
*956 Concerning personal attributes of the youth, we note that the juvenile's probation officer recommended against transfer, stating that the youth "has had very little services through the Probation Department," and had been on probation only approximately 100 days. The minor lived at home and had close family ties. He was enrolled in high school and near graduation at the time the charged offense was committed. He has received tentative acceptance by the University of Nevada-Las Vegas.
The mentioned matrix of past offenses, present charges and personal attributes fails to bring this case to a level which would clearly and convincingly justify transfer. We reverse the transfer order.

F. Sandra C. (No. 13679)
Sandra, age 17, is accused of stealing $118 worth of clothing from J.C. Penney's. The record shows two petty larceny adjudications prior to the present grand larceny charge as well as an adjudication of attempted larceny from the person.
There is very little in this record to show that community safety and the public interest can be served only by subjecting this juvenile to adult prosecution. The child has never been institutionalized by juvenile authorities. The girl's probation officer advised the judge that the juvenile court could offer a better rehabilitation program for Sandra; this could include juvenile institutionalization, an approach not yet tried with her.
The report to the court by the juvenile probation department indicates that the juvenile's degree of maturity is questionable and that she functioned "extremely well under an alternate living situation and intensive supervision in the past." It is true that she has had three adjudications relating to theft during the three years preceding the transfer hearing, but this does not mean that community safety and the best interests of the state require that she be removed from juvenile court and face adult imprisonment. Sandra is uneducated and immature. She has never been placed in a juvenile institution such as the Girl's Training Center in Caliente. There is every reason to believe that the optimal treatment of this girl from the standpoint of the community and the child is the imposition of some punitive sanction and continued training and rehabilitation in the juvenile court system. For these reasons the transfer order is reversed and the matter remanded to the juvenile division, wherein the minor will be treated in accordance with the Juvenile Court Act.

G. Amanda C. (No. 13819)
Amanda C., age 17, is charged with the felonious offense of taking property from the person of another under circumstances not amounting to robbery. She is accused of picking the pockets of a man with whom she was engaged in prostitution. The commission of this isolated, essentially non-violent crime, if proven, would not by itself, absent any established record of prior criminal activity, support in a clear and convincing fashion the necessity, in the public interest, to transfer this young lady to the adult system.
Amanda has no juvenile record of any kind. The certification report indicates that Amanda had been engaged in prostitution, but there is no evidence in the record of any adjudications, convictions or admissions of any previous offenses. As a consequence, if Amanda is to be transferred, it must be on the basis of the charged offense.
Certainly there are criminal offenses which are so heinous and so outrageous that standing alone they would require transfer even absent a record of prior criminal activity. This is not such an offense. The order of transfer will be reversed in this case.

Summary
By way of emphasis, we deem it advisable to summarize by enumeration the indicated procedures in transfer matters. We do so, thus:
1. Transfer proceedings are to be initiated by written motion or petition which states explicitly the charged felony offense or offenses upon which the requested transfer is based and which further states the *957 past record of criminal conduct. The motion or petition may also include material relating to the personal background and attributes of the subject youth which are considered material to the court's decision.
2. A transfer investigation is to be ordered and a report completed and filed. The investigative report is to be served on the subject minor and his parents or guardians and should state the details of the offense or offenses charged, the specific nature of previous adjudicated or admitted criminal offenses, and elements relating to personal attributes of the youth.
3. A preliminary determination of prosecutive merit is to be made to assure that there is probable cause to believe that the subject youth committed the offense or offenses charged. This may be done on the basis of legal admissions or confessions or by voluntary waiver of probable cause. When the minor challenges the issue of prosecutive merit and probable cause, due process requires that a hearing be held and that a judicial determination be made on the basis of the hearing.
4. The hearing judge should decide for or against transfer on the basis of the mentioned matrix of categories: nature and seriousness of the charged offense or offenses, persistency and seriousness of adjudicated or voluntarily admitted past criminal offenses and the personal attributes of the offender. Either seriousness of the charged offense or past record, or a combination of the two categories, may support a decision to transfer. Transfer may not be based solely on subjective evaluation of the youth, on character, attitude or other personal attributes alone; however, such matters may be considered in conjunction with the other factors in deciding whether transfer of the youth before the court is clearly and convincingly necessary for public protection. Transfer cannot be avoided merely by a showing of amenability to treatment in juvenile court.
5. Specific written findings which support the decision to transfer are to be made in each case as part of the formal order of transfer.
MANOUKIAN, C.J., and MOWBRAY, STEFFEN and GUNDERSON, JJ., concur.
NOTES
[1] NRS 62.080 provides as follows:

62.080 Procedure when person 16 years or older is charged with felony. If a child 16 years of age or older is charged with an offense which would be a felony if committed by an adult, the juvenile division of the district court, after full investigation, may in its discretion retain jurisdiction or certify the child for proper criminal proceedings to any court which would have trial jurisdiction of such offense if committed by an adult; but no child under 16 years of age may be so certified. After such a child has been certified for proper criminal proceedings and his case has been transferred out of the juvenile division, original jurisdiction of the person rests with the court to which the child has been certified and the child may thereafter petition for transfer back to the juvenile division only upon a showing of exceptional circumstances.
[2] Transferring or certifying juveniles to the adult criminal system has been variously referred to as "transfer," "certification," "waiver" and by other designations. We shall use the term "transfer" throughout this opinion.
[3] The common law recognized a comparable transition period. A child between seven and fourteen was presumed to be doli incapax, incapable of distinguishing between good and evil, and therefore not criminally responsible. Although prima facie free from criminal liability, such a child could be proven to be doli capax, capable of forming criminal intent, and convicted of a crime.
[4] Kent v. United States, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966).
[5] The Kent case dealt only with procedural rights and was not a decision on the merits as to whether a transfer should take place. The Kent criteria were offered somewhat gratuitously in the form of an appendix which set forth the terms of a "policy memorandum" issued by a judge of the juvenile court of the District of Columbia. These criteria are not consolidated into a substantive rule, but they do present useful material out of which a substantive rule can be derived.
[6] ABA Institute of Judicial Administration, Juvenile Justice Standards, Standards Relating to Transfer Between Courts, § 2.2C, Commentary (1980). Hereinafter, referred to as ABA-IJA, Standards Relating to Transfer Between Courts.
[7] A survey of some 207 juvenile court judges disclosed that the two factors which were weighed most heavily in making the decision to transfer to adult court were the past delinquency record of the juvenile and the seriousness of the charged offense. President's Commission on Law Enforcement and the Administration of Justice, Task Force Report: Juvenile Delinquency and Youth Crime (Washington, D.C., U.S. Government Printing Office, 1967), Appendix B, Table 5, p. 78.
[8] This opinion is intended to have the effect of affording considerable added breadth to the juvenile dispositional process. By expressly approving punishment and community protection as legitimate concerns of the juvenile court process we allow for a whole spectrum of sanctions by which youthful offenders can be held accountable for their criminal acts. These sanctions can include community service, deprivation of driving and other privileges, house detention, restitution to victims in the form of actual indemnity and additional compensation for intangible injuries suffered by crime victims, temporary detention in detention homes and detention of 16 and 17 year olds for brief periods in jail facilities apart from adult inmates. Obviously, punishment is not restricted to confinement and incarceration. Since the legislature has not set determinate sentences in training centers for commission of criminal offenses by juveniles, we would not undertake to do so judicially. We do not think it would be unreasonable, however, for juvenile judges to order periods of punitive detention in juvenile detention facilities, not to exceed 60 days.
[9] "[T]his youngster is charged with having committed a number of offenses in the past ... which he has denied and they have not been proven."