JEREMIAH B., a Minor, Appellant, v. THE STATE OF NEVADA, Respondent.

No. 21232

December 20, 1991 823 P.2d 883

*Sheerin, Walsh & Keele,* Carson City, for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Keith Loomis,* District Attorney, *Eileen Barnett,* Deputy District Attorney, Lyon County, for Respondent.

## OPINION

By the Court, SPRINGER, J.:

The question in this appeal is whether the trial court abused its discretion in certifying, under NRS 62.080,[1] a seventeen-year-old juvenile to the adult criminal court for prosecution as an adult. We hold that the juvenile court did not err, and we affirm the order of transfer.

On April 1, 1990, when Jeremiah was seventeen years and four months old, he killed two people while driving in a drunken and probably drug-impaired condition. A blood test taken over two hours after the homicide showed a blood alcohol content of .143 percent, well over the legal limit. A urine test showed that he had been using marijuana. Jeremiah ran into the rear end of another car. The car's occupants were thrown out of the car, and they died as a result of the collision.

With respect to each of the two homicides, Jeremiah faces felony charges of involuntary manslaughter, driving while under the influence of alcohol or controlled substances and causing death, driving while having 0.10 percent or more by weight of alcohol in his blood and causing death, and reckless driving causing death. Jeremiah's principle contention is that none of these crimes is so heinous and egregious as to justify a juvenile's transfer to the adult court under the first criterion for transfer set out in the case, In the Matter of Seven Minors, 99 Nev. 427, 664 P.2d 947 (1983).

---

[1]NRS 62.080 provides as follows:

62.080 Procedure when person 16 years or older is charged with felony. If a child 16 years of age or older is charged with an offense which would be a felony if committed by an adult, the juvenile division of the district court, after full investigation, may in its discretion retain jurisdiction or certify the child for proper criminal proceedings to any court which would have trial jurisdiction of such offense if committed by an adult; but no child under 16 years of age may be so certified. After such a child has been certified for proper criminal proceedings and his case has been transferred out of the juvenile division, original jurisdiction of the person rests with the court to which the child has been certified and the child may thereafter petition for transfer back to the juvenile division only upon a showing of exceptional circumstances.

In *Seven Minors* we turned away from the traditional test applied in transfer cases, that is to say, whether the minor was "amenable to treatment" in the juvenile court. *Seven Minors,* 99 Nev. at 433, 664 P.2d at 951. The traditional "amenability" or "fitness" rule formerly followed by this court (Marvin v. State, 95 Nev. 836, 603 P.2d 1056 (1979)), and still prevailing in most jurisdictions, focuses attention on the juvenile as a person rather than on the offense committed by the juvenile; and, under this doctrine, if the juvenile court were to conclude that a juvenile subject to transfer proceedings could be "treated" or rehabilitated by the juvenile court, then the juvenile would be retained within the jurisdiction of the juvenile court irrespective of the nature of the criminal conduct. *Seven Minors* changed the traditional juvenile court approach and placed emphasis not on the juvenile's amenability to juvenile court treatment nor on the juvenile's predicted response to the clinical armamentarium supposed to be possessed by the juvenile court but, rather, on the necessity for holding older youths accountable for the more serious, culpable and dangerous kinds of criminality. "The public interest and safety require that some youths be held accountable as adults for their criminal misconduct and be subjected to controls, punishment, deterrence and retribution found only in the adult criminal justice system." *Seven Minors,* 99 Nev. at 433, 664 P.2d at 951.

Since we made our ruling in *Seven Minors,* the juvenile court no longer bases transfer decisions on the issue of whether a juvenile facing transfer is a suitable subject for the juvenile court's rehabilitation efforts, but, rather, on the youth's criminal conduct and whether under the circumstances "the public interest and safety will permit the youth before the court to be treated as a child." *Id.* The juvenile court has decided in the present case that this young man should not be treated as a child; and we cannot say, as a matter of law, that the court abused its discretion in coming to this conclusion.

"The transfer process is based upon the sound idea that there is no arbitrary age at which all youths should be held fully responsible as adults for their criminal acts and that there should be a transition period during which an offender may or may not be held criminally liable, depending on the nature of the offender and the offense." *Seven Minors,* 99 Nev. at 430, 664 P.2d at 949. Jeremiah's case is at the upper margin of the mentioned transition period. Had Jeremiah been a few months older, he would, of course, have been held criminally liable. As matters stand, because he falls slightly below the arbitrary statutory age, he is entitled to a judicial determination as to whether, under the circumstances of this case, he is "entitled to the grace provided

by the Juvenile Court Act." *Id.* at 433, 664 P.2d at 951. In making the decision that Jeremiah was not entitled to this grace, the juvenile court properly relied on the *Seven Minors* case.

In *Seven Minors* we established criteria for making the transfer decisions. These criteria are: (1) the nature and seriousness of the charged offenses, (2) the persistency and seriousness of past adjudicated or voluntarily admitted criminal offenses, and (3) the personal attributes of the offender. "[P]rimary and most weighty consideration will be given to the first two of these categories." *Id.* at 435, 664 P.2d at 952.

"[T]he transfer decision may be based on either or both of the first two categories." *Id.* at 435, 664 P.2d at 952. Jeremiah has no record of an "adjudicated or voluntarily admitted past criminal offense" (*Seven Minors,* 99 Nev. at 434-435, 664 P.2d at 952).[2] Transfer in this case must be based on the first criterion, nature and seriousness of the crime. "[T]he nature and seriousness of the crime upon which the transfer proceedings are based may be such that the transfer proceedings may be based on this factor alone" (*Seven Minors,* 99 Nev. at 435, 664 P.2d at 952); however, "only the most heinous and egregious offenses would fall into this category." *Id.* at 435, 664 P.2d at 952.

To base transfer in the present case on the charged crimes alone, the crimes must be serious, heinous and egregious. The mere commission of a felony does not, of itself, warrant transfer; and in many instances where juveniles commit felonies, they do not *deserve* to be sent to adult court and do not have to "be held accountable as adults for their criminal misconduct and be subjected to controls, punishment, deterrence and retribution found only in the adult criminal justice system." *Id.* at 433, 664 P.2d at 951. The issue in this case becomes a rather narrow one: Does this record support a conclusion that Jeremiah's criminal conduct is so serious, heinous and egregious as to justify transfer to the adult court?

Jeremiah strongly asserts that although his crimes are certainly serious, they cannot properly be described as being among the most heinous and egregious crimes. Jeremiah argues that his crimes must be "willful and intentional" and that "nonintentional, nonpredatory conduct" may not be properly characterized as heinous or egregious. We must agree that had Jeremiah's criminal conduct been entirely inadvertent, accidental or negli-

---

[2]"Voluntarily admitted" refers to judicial admissions. An "admission" to a juvenile court petition charging delinquency is analogous to a guilty plea in the adult court.

gent in nature, it would not have been so heinous as to justify transfer under the strict standard set by *Seven Minors*. We conclude, however, that because Jeremiah has taken two human lives and because there is an element of willfulness and intentionality present here, the crimes committed in this case fall into the category of "heinous and egregious."

Whether Jeremiah's crimes were heinous and egregious, whether Jeremiah is a youth "who should properly be kept in the juvenile court system . . . [or] should be sent to adult court" (*Id.* at 434, 664 P.2d at 952), is to a large extent determined by his having wrongfully and unlawfully killed two human beings.[3] This fact, no doubt, was most seriously weighed by the juvenile court.

The heinousness and egregiousness of a crime must certainly be viewed by the transferring court with reference to the consequences flowing from the criminal conduct. It is very hard to make a case—with the victims' families looking on—that this young man, on the cusp of adulthood, should not be held accountable as an adult but, rather, should be sent to a juvenile "training center," there to be held for a relatively short time to be "benefitted by the reformatory educational discipline or other treatment" provided by the school. NRS 210.182. At first blush, it seems that justice requires more than this. Jeremiah's culpability, his accountability, his "just deserts," and, consequently, his susceptibility to being transferred is necessarily dependent upon the fortuity of his having collided with a vehicle with human occupants, rather than a tree or inanimate object. This is true because, very simply, our law holds us all legally and morally responsible for the consequences of our bad acts. In some instances heinousness may be found in the mental aspect of the crime, say an attempt with no harmful consequences at all but

---

[3] In *Seven Minors* we stressed the need to hold juveniles "accountable" for their criminal misdeeds. This accountability refers not only to youthful offenders' "debt to society" owed by virtue of their public offenses against society as a whole but also to the debt owed to the victims of their crimes. Punitive "just deserts" must be viewed in the light of both of these factors. Although we have tended to lose sight of the fact, in the early origins of criminal law the sole purpose of the law was to compensate the victim, to bring peace to the realm by supplanting the blood feud by means of inducing the victim or his kin to accept money instead of taking violent revenge. There is a present-day trend to shift the law's emphasis more toward the rights of outraged victims than to the inherent blameworthiness of the criminal conduct. It is plain that if Jeremiah had collided with a telephone pole rather than with the deceased victims' automobile, he would not be in nearly as much trouble with the law. That he killed two people is a very significant part of the transfer decision in this case. An almost-adult youth with a history of illegal drug and alcohol use who kills two people while driving in a willfully drunken condition probably, in the interest of the victim and in the interests of society, deserves to be held accountable in the adult system.

very harmful intentions (for example, plan to kidnap a group of small children for sexual purposes). In other instances, as here, the severity, the heinousness, of the crime is derived from the consequences of relatively less serious intentions. The point is that we can legitimately consider the fact of the deaths in this case in defining heinousness and egregiousness. Under the circumstances of this case, we cannot disapprove of the trial court's decision transferring Jeremiah to the adult system. We all understand that similar acts sometimes generate great harm; sometimes not. A harmful result is conceptually independent of the offender's act; yet penalties and consequences under our law are intimately connected with the nature of the harm done.

If Jeremiah had gotten drunk and merely crashed his car into a telephone pole, we certainly would not be talking here about a "heinous" or "egregious" offense. It is the *actua reus* rather than the *mens rea* that brings this case into the ambit of transferability. The moral reprehensibility of one who intentionally puts himself in the position of being an alcoholically impaired motor vehicle operator may be essentially the same whether the alcoholic impairment results in hitting a tree or hitting and killing a group of pedestrians; but the consequences and price that must be paid by such an offender are far different in these two situations. Crimes and punishments are by their very nature defined in terms of harmful consequences. Arson is defined in terms of incinerated structures; battery in terms of physical injury to another; homicide in terms of the death of a human being. Jeremiah, like all of us living under the law as it now exists, must face the consequences of his wrongdoing.

Thus, although Jeremiah's counsel is correct in telling us that heinous and egregious offenses are usually thought of in terms of willful and intentional wrongdoing and that "nonintentional, nonpredatory conduct" is excepted, we now hold that causing the death of another human being by a person who willfully consumes alcohol and thereafter operates a motor vehicle is of such a heinous and egregious nature as to justify transfer under NRS 62.080 and under our case of *Seven Minors*.

The mere fact of the homicides does not in itself, however, bring these crimes into the range of heinousness and egregiousness. If Jeremiah had caused these deaths by mere carelessness or inattention, such conduct would not justify his transfer. But this is not the case here; there is clearly an element of willful misconduct in this case. These crimes are not crimes of purely unintended consequences. It appears from the statement of Deputy Juvenile Probation Officer Moore that Jeremiah "willfully intend[ed] to be under the influence of alcohol and marijuana and willfully took control of and drove a motor vehicle under the

influence of these substances." In other words, Jeremiah drank and took drugs *knowing* that he was going to be driving.

The word heinous means hateful or malicious. We find it persuasive that the legislature has included one's driving a vehicle after consuming alcohol or drugs, knowing that the driver was going to drive thereafter, as an act which, along with malice, subjects the offender to punitive damages. NRS 42.010.[4]

Under NRS 42.010, a person who kills or injures another "by the operation of a motor vehicle in violation of NRS 484.379 or 484.3795 after willfully consuming or using alcohol or another substance, knowing that he would thereafter operate the motor vehicle," is subject to a higher degree of civil responsibility than one who kills or injures as a result of mere negligence. This is legislative recognition of the high degree of culpability which should be attached to the conduct described in the statute. Few, if anyone, in today's world can be unmindful of the dangers to life and bodily integrity which are inherent in chemically-impaired driving. Jeremiah's intentionally drinking, knowing that he was going to drive, and thereafter killing two human beings, constitutes the kind of heinous and egregious criminal conduct that justifies transfer under the *Seven Minors* case.

The third *Seven Minors* criterion, "come[s] into play principally in close cases in which neither of the other two categories clearly impels transfer to adult court." The "subjective factors" can include factors such as "age, maturity, character, personality and family relationships and controls." *Seven Minors,* 99 Nev. at 435, 664 P.2d at 952. Although the nature and seriousness of these alcohol and drug-related homicides alone support transfer, the subjective factors relating to Jeremiah appear to have been carefully considered by the juvenile court, and we see no abuse of discretion in the juvenile court's not weighing these factors in Jeremiah's favor so as to retain him in the juvenile court.

One of the tragic aspects of this case is the fact that Jeremiah has been involved in the use of drugs and alcohol since he was twelve or thirteen years old. His parents either ignored or tacitly approved of Jeremiah's conduct. These abuses, it is claimed, led

---

[4]NRS 42.010(1) provides:

Exemplary and punitive damages: Injury caused by operation of vehicle after consumption of alcohol or controlled substance.

1. In an action for the breach of an obligation, where the defendant caused an injury by the operation of a motor vehicle in violation of NRS 484.379 or 484.3795 after willfully consuming or using alcohol or another substance, knowing that he would thereafter operate the motor vehicle, the plaintiff, in addition to the compensatory damages, may recover damages for the sake of example and by way of punishing the defendant.

to the arrest of Jeremiah's emotional development and to a diminished responsibility on his part for his criminal actions. Still, Jeremiah was able to manage his parents' retail sales business and generally conducted himself more as an adult than as a child. Jeremiah is blessed with a high level of natural intelligence, and, to his credit, has displayed a rather mature appreciation of the magnitude of his crimes and a sincere remorse for the harm that he has inflicted on innocent victims. The record contains some earnest pleading by counselors and others who believe sincerely that Jeremiah should be retained in the juvenile court and that his transfer to the adult court to be prosecuted for crimes that call for mandatory prison sentences would result in a waste of Jeremiah's life. We must, however, all face the bitter truth: Jeremiah was, but for his not meeting the legal criterion for adulthood, an adult at the time he committed these crimes. He has committed an adult crime; and he must face adult punishment. It is too bad; but this is the truth of the matter.

Jeremiah Bopko will now be treated by our law as an adult and not as a child. If Jeremiah is convicted of any of the stated charges, he faces a mandatory term of imprisonment of at least one year. Because of this, we make note of a fact made known to us at oral argument: Jeremiah was placed in confinement at the time of his arrest on April 2, 1990. We are advised that he has been locked up since this time in a juvenile detention facility. Even though these juvenile institutions are not thought of as providing punitive confinement, there can be no doubt that Jeremiah has been involuntarily incarcerated since April 2, 1990. If the time comes that Jeremiah faces sentencing for felony convictions arising out of this incident, there is no reason why he should not be given credit under NRS 176.055[5] for confinement time already served; and we so hold.

The juvenile court concluded "as a matter of law that the State has shown, by clear and convincing evidence, that Jeremiah J. Bopko falls within the criteria set forth in *Seven Minors*" and "that the State has shown by clear and convincing evidence that

---

[5]NRS 176.055(1) provides:

 1. Except as otherwise provided in subsection 2, whenever a sentence of imprisonment in the county jail or state prison is imposed, the court may order that credit be allowed against the duration of the sentence, including any minimum term thereof prescribed by law, for the amount of time which the defendant has actually spent in confinement before conviction, unless his confinement was pursuant to a judgment of conviction for another offense. Credit allowed pursuant to this subsection does not alter the date from which the term of imprisonment is computed.

the public safety and welfare require the granting of the Motion to Certify . . . ." The juvenile court did not err in reaching this conclusion and in transferring this youth to the adult court. The judgment of the juvenile court is affirmed.

MOWBRAY, C. J., ROSE, STEFFEN and YOUNG, JJ., concur.