**Rolando TORRES, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 14–01–01273–CR.**

Court of Appeals of Texas,
Houston (14th Dist.).

Dec. 19, 2002.

Frances M. Northcutt, Houston, for appellant.

Eric Kugler, Houston, for appellee.

Panel consists of Chief Justice BRISTER and Justices HUDSON and FOWLER.

## OPINION

J. HARVEY HUDSON, Justice.

Appellant, Rolando Torres, was convicted by a jury of murder and sentenced to 30 years' confinement in the Institutional Division of the Texas Department of Criminal Justice. In four issues, appellant contends (1) the trial court erred in denying his motion for mistrial, (2) the trial court erred in overruling his objection to testimony, (3) the evidence is factually insufficient to support the verdict, and (4) the trial court erred in overruling his objection to the prosecutor's improper jury argument. We affirm.

## I. BACKGROUND

On March 10, 2001, a birthday party for Fernando Torres was held at the home of Claudia Rodriguez. Both appellant and complainant, Torin ("Toro") Murphy, attended the party. Appellant fell asleep on the couch after drinking. While appellant was asleep, Rodriguez and Sylvia Pizenia put make-up on him, painted his fingernails, and tied his shoelaces together. Toro's girlfriend, Rosa Delgadillo, wanted to untie appellant's shoelaces so he would not fall; this made Toro jealous.

Appellant's girlfriend, Belinda Cuevas, woke him up. As appellant and Cuevas were leaving the party with his girlfriend, appellant said to Toro, "My name is Roland." Toro responded, "No, your name is Pussy with a capital P." Appellant did not say anything in response. Cuevas does not remember Toro making an offensive comment to appellant when they were leaving the party. However, Cuevas testified Toro told appellant that another person at the party named Manuel wanted to fight appellant. Appellant left the party upset with Toro because he was trying to get everybody against each other. According to Cuevas, appellant said, "Payback [is] a bitch," and he would get Toro. Appellant, however, was not known to fight back.

At 9:00 p.m. on March 14, 2001, Toro and Delgadillo walked to the store to buy a soda. On the way, they passed by Woody's Ice House. Although Delgadillo did not notice anyone standing outside Woody's, she observed an older model white Suburban that passed them three or four times. When they were walking back from the store, Delgadillo saw two men standing against the side wall of Woody's.

Delgadillo saw the men follow her and Toro. Delgadillo then heard gun shots fired behind her. Toro screamed and pushed Delgadillo out of the way. After the shooting had stopped, Delgadillo ran to the bar and told the people inside to call the police. As she ran into the bar, Delgadillo saw the shorter man climb into the back of the Suburban.

According to Delgadillo, one of the men was five feet six inches tall, skinny, and wearing long blue-jean shorts, and a black sweater with a hood over his head and white lettering down the length of the sleeves. The other man was taller and wearing a black sweater and blue-jean pants. Delgadillo recognized the shorter man as appellant by his sweater, which she had seen him previously wear, and his skinny legs and knees, which their friends joked about. Delgadillo testified there was enough lighting to see colors and the men's forms, but not their faces. Immedi-

ately after the shooting, Delgadillo told the police she thought the shorter man was appellant.

Appellant arrived at Cuevas' home between 9:30 and 10:00 p.m. on the same night of the shooting. Appellant was standing at the gate; he appeared to be nervous. Appellant was wearing a gray and black sweater, jeans, and white and blue tennis shoes. Cuevas testified that appellant said, "I did it." When Cuevas asked appellant if he had killed Toro, appellant responded that he and Fernando Torres "got him." Cuevas spoke to Delgadillo the following day. Delgadillo told her Toro had been shot. Cuevas did not admit to Delgadillo that she already knew Toro had been shot, but instead feigned surprise.

Later that night, appellant went to the house of David Gomez. Appellant woke up Gomez and said that he "got Toro," who was the guy who had been messing with him, and made a gesture like he was shooting someone. Gomez had been drinking beer and smoking marijuana and was asleep when appellant told him about Toro. Gomez also asserts that when he gave his statement, the police pressured him by threatening to keep him at the station.

After interviewing Delgadillo, Deputy Tracy Shipley of the Harris County Sheriff's Department decided that she needed to talk to appellant. Shipley and another deputy, Ronald Hunter, set up a surveillance of appellant's house. On March 19, 2002, Shipley and Hunter observed a gray Lincoln Towncar pulling out of the driveway. Shipley and Hunter followed the Towncar. After observing the Towncar running through a stop sign, Shipley and Hunter radioed a marked patrol unit to make a traffic stop. As Shipley and Hunter were approaching the stopped Towncar, they heard appellant say, without any prompting, "this [is] about the dude that got shot, Toro." Shipley and Hunter asked everyone in the Towncar to come voluntarily to the station.

Appellant gave a voluntary written statement in which he recounted the events that took place between him and Toro at the party. According to appellant's statement, Toro told him three other men at the party wanted to fight him. Appellant confronted the men; they told him they did not want to fight him, but that Toro told them appellant wanted to fight them. Toro asked appellant if he was "going to let those dudes get away with that." When appellant told Toro that he had already confronted the men and found out they did not want any trouble and he was going to drop the issue, Toro called him a pussy. Appellant and Cuevas then left the party. Appellant stated he neither killed Toro nor had any knowledge of who killed him.

Although appellant was free to leave the station after he had given his first statement, he was asked to stay. At that point, Shipley wanted to speak to Cuevas. After taking Cuevas' statement and considering the statements of the other occupants of the Towncar, Shipley put appellant in jail on a 24-hour hold.

Detective Wayne Kuhlman was in an interview room with appellant when he noticed what appeared to be blood spatter on appellant's shoe. When Kuhlman pointed it out to appellant, he put his finger in his mouth and began to rub the spot until Kuhlman told him to stop and take off his shoes. The substance on appellant's shoe tested "presumptive positive" as blood, but no DNA was detected, possibly because the sample was too small.

On March 20, 2001, after Hunter had given him his *Miranda* warnings, appellant gave a second written statement while in custody. In his second statement, ap-

pellant admitted his "first statement ... was not the complete truth" and further stated:

I am not the triggerman. It was Fernando. I know Fernando by my girlfriend's (Belinda's) cousin Sylvia. Fernando is Sylvia's boyfriend. He drives a maroon 4–dr Pontiac.

On the night Toro was killed, he was just walking with a husky shaped Hispanic female to the bar (Woody's Ice House) or to the gas station that was off the freeway, when all of a sudden Sylvia who was driving the maroon Pontiac stopped the car on the side of the street next to the bar. Sylvia was driving, Fernando was in the front passenger seat and I was in the back seat.

When Sylvia stopped the car, Fernando got out of the car and all of a sudden shots ranged [sic] out from outside of the car. I saw Fernando shoot Toro in the back about five of [sic] six or a little bit more times. I got out of the car a short distance along [sic] Fernando. I could not believe my eyes of what I was seeing. I was blank and I had chills in my body when I saw him shoot Fernando [sic]. We hurried back into the car and we left, traveling East on Nimitz Street. I don't think Sylvia knew what was going to happen, because she was asking Fernando a lot of questions about where we were driving before the shooting. He just kept giving her orders of where to drive. I did not know what was going to happen....

Fernando Torres testified he was arrested and charged with Toro's murder and spent four months in jail. Torres said he had never spoken to Toro before the birthday party; he talked to Toro about joining Toro's gang. Torres testified he was afraid of complainant the night of the party. Torres stated that "in [his] mind [he] thought Toro was sent by the Raza Uneda [sic] gang to do [him] in."

When Torres and appellant were in the same holding cell, appellant confessed that he had shot Toro and he was sorry he had told the police Torres had done it. Torres, an apprentice plumber, testified he was in a welding class from 5:30 to 9:00 p.m. on the night of Toro's murder. Torres further testified Sylvia Pizenia, who appellant claims drove the car at the time of the shooting, does not know how to drive.

Toro sustained eight gunshot wounds—four bullets stayed in the body and four went through the body. The cause of death was multiple long-range gunshot wounds.

## II. FACTUAL SUFFICIENCY

In his third issue, appellant challenges the factually sufficiency of the evidence supporting his conviction. When reviewing claims of factual insufficiency, it is our duty to examine the jury's weighing of the evidence. *Clewis v. State*, 922 S.W.2d 126, 133, 134 (Tex.Crim.App.1996). In other words, we must view the evidence "without the prism of 'in the light most favorable to the prosecution'" and set aside the verdict only if it is "so contrary to the overwhelming weight as to be clearly wrong and unjust." *Id.* at 129. Thus, when reviewing factual sufficiency challenges, appellate courts must determine "whether a neutral review of all of the evidence, both for and against the finding, demonstrates that proof of guilt, although adequate if taken alone, is greatly outweighed by contrary proof." *Johnson v. State*, 23 S.W.3d 1, 11 (Tex.Crim.App.2000).

Appellant complains there is no physical evidence to tie him to the murder and that the evidence arguably supporting his guilt is entirely circumstantial, consisting mostly of nonspecific remarks appellant made to Cuevas and Gomez that he had "gotten"

Toro. Appellant further argues there was no motive for him to kill complaint, but there was evidence Fernando Torres had a motive to kill complainant. Appellant also claims Gomez and Torres were coerced into giving their statements. Finally, appellant asserts the evidence indicates both of his statements to the deputies were involuntary.

We find the evidence is factually sufficient to support appellant's conviction. The evidence consists of more than a few vague remarks by appellant. Cuevas testified that appellant told her he would get Toro, and when she asked appellant if he had killed Toro, he said he and Torres "got him." Appellant told Gomez he got Toro while he simultaneously made a gesture like he was shooting a gun. Appellant's remarks were specific, not vague. Immediately following the shooting, Delgadillo identified one of the two men as appellant.

Appellant gave two statements, the second of which refers to the first as "not the complete truth," and places appellant at the scene of the shooting. The second statement also describes trouble that arose between appellant and Toro at a party just a few days before the shooting, providing a possible motive for appellant. Moreover, when one of the deputies pointed out to appellant what appeared to be a possible blood spatter on his shoes, he immediately tried to rub it out. That substance tested "presumptive positive" as blood.

Appellant claims Torres had a stronger motive to kill Toro than he. Torres, however, testified he was in a welding class the night of the shooting. Appellant also suggests his written statements were involuntary. The trial court, however overruled

his motion to suppress and instructed the jury on the admissibility of the defendant's statements.[1]

The jury is the sole judge of the facts, the credibility of the witnesses, and the weight to be given the evidence. *Beckham v. State*, 29 S.W.3d 148, 152 (Tex. App.-Houston [14th Dist.] 2000, pet. ref'd). Therefore, the jury may believe or disbelieve all or part of any witness's testimony. *Jones v. State*, 984 S.W.2d 254, 258 (Tex. Crim.App.1998). Reconciliation of any conflicts in the evidence falls within the exclusive province of the jury. *Heiselbetz v. State*, 906 S.W.2d 500, 504 (Tex.Crim. App.1995).

The jury was entitled to determine what weight to be given the evidence and the credibility of the witnesses and whether or not to believe the testimony of any witness. By its verdict, it apparently chose to believe appellant told Cuevas and Gomez that "he got" Toro, *i.e.*, he had killed him, that Gomez' and Torres' statements were true and not made under duress, and appellant's statements were not involuntary. Viewing the evidence without the prism of in the light most favorable to the prosecution, we do not find the verdict so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. Appellant's third issue is overruled.

### III. DISPOSITION OF CODEFENDANT'S CASE

In his first issue, appellant claims the trial court erred in denying his motion for mistrial after the prosecutor asked Fernando Torres if his case had been no-billed and he had been released. The disposition of a codefendant's case is

---

1. To the extent appellant claims on appeal that his written statements were involuntary, he has not raised this as a separate issue and has provided no argument or authority, thereby waiving any complaint on appeal. TEX.

R.APP. P. 38.1. Even if his statements were involuntary, the evidence is nonetheless factually sufficient to support his conviction for murder.

generally not admissible in the trial of another codefendant. *Miller v. State*, 741 S.W.2d 382, 389–90 (Tex.Crim.App.1987); *Rodriquez v. State*, 552 S.W.2d 451, 454–55 (Tex.Crim.App.1977); *Morales v. State*, 11 S.W.3d 460, 465–66 (Tex.App.-El Paso 2000, pet. ref'd); *Beasley v. State*, 838 S.W.2d 695, 703 (Tex.App.-Dallas 1992, pet. ref'd).

The prosecutor elicited testimony from Torres that he had been arrested and charged with Toro's murder and had spent four months in jail on that charge. The prosecutor then asked Torres, "And at some point was your case no billed by the Grand Jury and you were released?" The trial court sustained appellant's objection and instructed the jury to disregard that question, but denied appellant's motion for mistrial.

■■■ The denial of a motion for mistrial is reviewed under the abuse of discretion standard. *Trevino v. State*, 991 S.W.2d 849, 851 (Tex.Crim.App.1999). A mistrial is required only when "the question is 'clearly calculated to inflame the minds of the jury and is of such a character as to suggest the impossibility of withdrawing the impression produced on their minds.'" *Moore v. State*, 882 S.W.2d 844, 847 (Tex.Crim.App.1994) (quoting *Gonzales v. State*, 685 S.W.2d 47, 49 (Tex. Crim.App.1985)). A trial court does not abuse its discretion when its decision is at least within the zone of reasonable disagreement. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex.Crim.App.1990). Asking an improper question will rarely require a mistrial,[2] and an instruction to disregard will cure error associated with an improper question and answer in most cases.[3] An instruction to disregard evidence of the disposition of a codefendant's

case is usually sufficient to cure any error. *Morales*, 11 S.W.3d at 466; *Beasley*, 838 S.W.2d at 703.

Appellant argues the prosecutor was attempting to inflame the jury by suggesting appellant had lied in his statement by placing blame on Torres whom the grand jury found to be innocent. Appellant contends the prosecutor's question was harmful for two reasons. First, appellant maintains the evidence of his guilt merely consists of inferences from ambiguous remarks he allegedly made to Cuevas and Gomez that he "got" complainant, with no physical evidence to tie him to the murder. Second, appellant argues the prosecutor's question was clearly calculated to refute evidence that Torres had a strong motive to kill complainant because he testified he was afraid of complainant and his gang.

Appellant's second statement established that appellant had already lied in his first statement and it placed him at the scene of Toro's murder. Torres testified he was in a welding class the night of the shooting in addition to testifying about his fear of Toro and his gang. We have already determined that evidence of appellant's guilt consists of more than ambiguous remarks made to Cuevas and Gomez and is sufficient to support appellant's murder conviction. Therefore, we hold the instruction to disregard cured any error and the trial court did not abuse its discretion in overruling appellant's motion for a mistrial. Appellant's first issue is overruled.

### IV. COMPLAINANT'S REMARKS

■■ In his second issue, appellant claims the trial court erred in overruling his objection to Delgadillo's testimony

---

2. *Moore*, 882 S.W.2d at 847.

3. *Ovalle v. State*, 13 S.W.3d 774, 783 (Tex. Crim.App.2000); *Fuller v. State*, 827 S.W.2d 919, 926 (Tex.Crim.App.1992).

about statements Toro made to her after the shooting. Delgadillo testified during the guilt-innocence stage of the trial that after the shooting complainant told her that he loved her.

■ Nonconstitutional error that does not affect substantial rights must be disregarded. TEX.R.APP. P. 44.2(b). Substantial rights are not affected by the erroneous admission of evidence if the appellate court, after reviewing the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect. *Solomon v. State*, 49 S.W.3d 356, 365 (Tex.Crim.App. 2001). In determining whether the jury's decision was adversely affected by the error, the Court of Criminal Appeals has instructed that we should consider everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with the other evidence. *Morales v. State*, 32 S.W.3d 862, 867 (Tex.Crim.App. 2000). Evidence of an appellant's guilt is also a factor for consideration in the harm analysis conducted by the reviewing court. *Motilla v. State*, 78 S.W.3d 352, 358 (Tex.Crim.App.2002).

Appellant contends that whether Toro loved Delgadillo is not relevant to his guilt or innocence, but rather, the only purpose in having Delgadillo testify about Toro's statement is to evoke sympathy from the jury and to reach a guilty verdict based on that sympathy. Appellant asserts that because the evidence of his guilt is circumstantially weak, it cannot be said that the error had no effect, or a slight effect, on the jury's verdict.

Appellant relies on this court's decision in *Motilla v. State* in support of his contention. 38 S.W.3d 821 (Tex.App.-Houston [14th Dist.] 2001), *rev'd*, 78 S.W.3d 352 (Tex.Crim.App.2002). In *Motilla*, the trial court overruled the defendant's objection to testimony that the complainant was adopted and had a twin brother. *Id.* at 826. On appeal, this court held the testimony was not relevant, but instead was an attempt to persuade the jury to base its verdict of murder on sympathy and reversed the conviction because we could not conclude the error had no effect, or but a slight effect, on the jury's verdict. *Id.* at 827. After conducting its own harm analysis, the Court of Criminal Appeals reversed this court's decision and affirmed the judgment of the trial court, finding the testimony was irrelevant, but harmless. *Motilla*, 78 S.W.3d at 360.

Whether Toro loved Delgadillo is not relevant to appellant's guilt. However, the trial court's error in admitting that testimony is harmless. The evidence supporting the jury's guilty verdict is far from "weak." Moreover, the State did not emphasize the error because no reference was made to that testimony in closing arguments. *See Motilla*, 78 S.W.3d at 359. Appellant's second issue is overruled.

## V. PROSECUTOR'S ARGUMENT

In his fourth issue, appellant claims the trial court erred in overruling his objection to the prosecutor's improper closing argument in the punishment stage of the trial that asked the jurors to put themselves in the place of the victim. During the punishment hearing, the State's attorney made the following argument:

> In thinking about what to do with this defendant, I want you to think of the last few moments that Torin was alive because that is appropriate. Rosa told you that she just remembers hearing him scream. You know he was in pain.

I think it is very easy in the course of a trial to hear evidence in a very anti-septic, sort of unemotional way, and for a moment before you decide what to do with this defendant, I want you to close your eyes and think of how that young man felt.

[APPELLANT'S COUNSEL]: I object to the prosecutor asking the jury to place themselves in the position of the decedent in this case. I think that's irrelevant and objectionable.

THE COURT: Overruled.

[THE STATE'S ATTORNEY]: Don't you know he was scared? Don't you know he said to her, ["]Don't leave me. Please don't let me die. I love you.["] Nobody should have to die that way and that is worthy of your consideration.

■ The four permissible areas of jury argument are (1) summation of the evidence; (2) reasonable deductions from the evidence; (3) answer to the argument of opposing counsel; and (4) plea for law enforcement. *Guidry v. State*, 9 S.W.3d 133, 154 (Tex.Crim.App.1999). Appellant contends the prosecutor's argument fell outside the permissible areas of jury argument; the State contends the argument was a legitimate plea for law enforcement.

Several courts have held that arguments similar to the one made here are improper. For example, in *Brandley v. State*, 691 S.W.2d 699, 712 (Tex.Crim.App.1985), before being cut off by an objection, the prosecutor argued:

I think you can see from the evidence, from some of the photographs, there is a look of stark terror in the photographs seen on her [the decedent's] face. It is fair for you to think about the feelings of the father who lost his baby daughter and it is fair for you to think about how you would feel if you lost your children in considering ...

Initially, the prosecutor asked the jury, without objection, to consider the victim's terror. As such, part of the argument in *Brandley* is very similar to one made here. In *Brandley*, however, the prosecutor continued by asking jurors to imagine how they would feel if they had lost a daughter. The Court of Criminal Appeals held the argument was improper because it was essentially a plea for abandonment of objectivity. *Id.*

Likewise, in *Boyington v. State*, 738 S.W.2d 704, 709 (Tex.App.-Houston [1st Dist.] 1985, no pet.), the State's attorney asked the jury to assess the same punishment they would want to inflict upon the defendant if the offense had been committed against them:

If you are going to go back there and show leniency, that's fine. But please have a good reason for it. Because what would you do if this happened to your family? You know, all of you have got families here and you have got kids and you have got a home. How would you feel if your home was firebombed one night and you saw your children on fire? What do you think should happen to a person like Barron Lee Boyington, that does something like that? And it is your opportunity to say, "Barron Lee Boyington, you have no right to do what you did to that Anderson family, and we aren't going to put up with it." So please put yourself in that place when you are deciding this. Put yourself in the place of that Anderson family and imagine that was your family that was firebombed in the middle of the night. Imagine that it was your son that has his legs on fire. Imagine that it was your home that was burned out. Would you want mercy shown? Would you want leniency shown? ....

And please keep in the forefront of your mind just like it was your family

that received the fire bomb and you are in a den at 3:00 a.m. on a hot summer evening. Keep that in the forefront of your mind and just think what you would want to happen in that situation. The Court of Appeals held this argument could only have been designed to inflame the passions of the jury and, as such, was manifestly improper. *Id.*

 The argument made here, however, is distinguishable from the arguments made in *Brandley* and *Boyington.* In both of those cases, the prosecutor sought to have jurors assess the same punishment they would want to impose upon the defendant if the offense had been perpetrated against them personally. The difficulty with this argument is that victims frequently, and understandably, long for vengeance far out of proportion to the severity of the offense. It is precisely this aspect of human behavior that led to ancient blood feuds, and it was the need to suppress the destructive nature of blood feuds that led to the evolution of much of our English law.[4] Thus, it is the law's objective to assess a reasoned, rational, and just punishment that the fits both the crime and the offender.

Today, the Sixth Amendment of the United States Constitution and article I, section 10 of the Texas Constitution guarantee the accused the right to a fair trial before an impartial jury. *Howard v. State,* 982 S.W.2d 536, 539 (Tex.App.-San Antonio 1998, pet. dism'd). It is this guarantee of impartiality that prohibits a witness, and thus a victim, from serving as a juror and imposing punishment upon the defendant. *See* TEX.CODE CRIM. PROC. ANN. art. 35.16(a)(6) (Vernon 1989). In fact, a juror may not even be related to the victim within the third degree of consanguinity or affinity. TEX.CODE CRIM. PROC. ANN. art. 35.16(c)(1) (Vernon Supp.2002). Thus, in *Brandley* and *Boyington,* the prosecutor sought to do by imagery and speculation what the law prohibits in fact, *i.e.,* have the defendant's punishment assessed by the victim of the crime, or at least assessed by a jury who will endeavor to assess the same punishment the victim would impose.

 But while punishment, in our modern system of criminal justice, must be based upon the moral blameworthiness of the defendant (and not the victim's desire for revenge), the jury is still entitled to consider the full, unvarnished specter of the defendant's actions. Evidence of the victim's physical, mental, or pecuniary injury is highly relevant when considering the full magnitude of the crime. Moreover, the human mind is incapable of making any subjective judgment, perhaps even any rational decision, without reference to personal experience.[5] In evaluating the

---

**4.** "It is commonly known that the early forms of legal procedure were grounded in vengeance. Modern writers have thought that the Roman law started from the blood feud, and all the authorities agree that the German law begun in that way. The feud led to the composition, at first optional, then compulsory, by which the feud was bought off. The gradual encroachment of the composition may be traced in the Anglo Saxon laws, and the feud was pretty well broken up, though not extinguished, by the time of William the Conqueror." OLIVER WENDELL HOLMES, JR., THE COMMON LAW 2 (1881). Thus, the original purpose of criminal law was to bring peace to the realm by supplanting the blood feud with a system acceptable to the victim or his kin, thus avoiding the high social costs of blood feuds. *See United States v. Vaknin,* 112 F.3d 579, 582 (1st Cir.1997); *Jeremiah B. v. State,* 107 Nev. 924, 823 P.2d 883, 885 (1991).

**5.** Judges, for example, must routinely look to their personal experience when making such subjective judgments. *See Montgomery v. State,* 810 S.W.2d 372, 391 (Tex.Crim.App. 1991) (op. on reh'g) (determining the relevancy of evidence); *Missouri Pac. R.R. Co. v. Alderete,* 945 S.W.2d 148, 150 (Tex.App.-San Antonio 1996, no writ) (determining the ap-

heinousness of an offense, each juror must necessarily rely upon his own feelings, emotions, and experiences because there is no other criterion by which he or she can evaluate the facts. The genius of the jury system, however, is that the individual perspectives of twelve jurors are blended into one punishment verdict.

■ Here, the jury was asked to make reasonable deductions from the evidence regarding the degree of terror and pain experienced by the complainant shortly before his death. This is entirely appropriate. For example, in *Williams v. State*, 732 S.W.2d 762, 765 (Tex.App.-Beaumont 1987, no pet.), the State's attorney argued in an aggravated sexual assault case: "The pain and the anguish and the terror that she [the victim] has will remain in her heart and mind for as long as she lives." Of course, a juror can only appreciate the degree of pain and anguish experienced by the victim by considering how he or she would feel in the same situation. Nevertheless, the Court of Appeals held the argument to be a reasonable deduction from the evidence, based upon the victim's testimony, that she would be emotionally scarred as a result of the sexual assault. However, the court held the prosecutor erred when he thereafter argued, "Place yourselves in the shoes of the victim, the most personal violation of her body. How would you feel? *What would you want?* " *Id.* (emphasis added). The distinction between fully appreciating the victim's pain and suffering, on the one hand, versus how the victim would want the defendant punished, on the other, is a subtle, but important distinction. In the first instance, the prosecutor is merely summarizing the evidence, making a reasonable deduction from the evidence, or making a legitimate

plea for law enforcement. In the second instance, the prosecutor is asking the jury to assess punishment not on impartial objective notions of justice, but upon personal passion accelerated by the outrage every human being naturally feels toward one who has wrongfully caused him pain, embarrassment, grief, or loss.

This distinction was recognized by the First Court of Appeals in *Linder v. State*, 828 S.W.2d 290, 303 (Tex.App.-Houston [1st Dist.] 1992, pet. ref'd). There the State's attorney made the following argument:

> Can you imagine what it's like to know that someone has gone into your home ... Imagine what it's like and what kind of person it takes to go back and pick up an innocent defenseless woman whose son is sleeping right next to her ... Can you imagine what it was like to be that woman? ... You wake up. You don't know what's going on.... Oh, my God. What's happening? ... Who is this man coming into your home? ... Your four year old son comes to your head and he's got his arms around your head and you're terrified that something will happen to your son.

*Id.* The court distinguished the arguments made in *Brandley* and *Boyington,* noting that in those cases the prosecutor "directly and explicitly urged the jury to punish the defendant as if he had actually attacked them and their families." The court observed, however, that in *Linder,* the prosecutor's review of the evidence focused only on the actions of the defendant and the experience described by the victim in her testimony. As such, the court held the argument was a proper summation of the evidence. *Id.*

We realize that not every court in Texas has recognized the distinction between

propriateness of ad litem fees); *Star Houston, Inc. v. Kundak,* 843 S.W.2d 294, 299 (Tex. App.-Houston [14th Dist.] 1992, no writ) (determining the reasonableness of attorney fees).

*properly* asking the jury to place themselves in the shoes of the victim to understand the pain, injury, or loss suffered by the victim versus *improperly* asking the jury to place themselves in the shoes of the victim to consider what punishment the victim would want to impose upon the defendant.[6] However, we have found no controlling authority refuting such a distinction. Moreover, we find the rationale articulated in *Linder* to be very persuasive.

Like the First Court of Appeals, we note that the Louisiana Supreme Court has also abolished any per se prohibition of asking jurors to imagine themselves in the shoes of the victim. In *State v. Moore*, 432 So.2d 209 (La.), *cert. denied*, 464 U.S. 986, 104 S.Ct. 435, 78 L.Ed.2d 367 (1983), the prosecutor asked the jury to feel the fear experienced by the victim shortly before his death.[7] The court first observed that all of the remarks and observations made by the prosecutor could be reasonably deduced from the evidence. The court then wrote:

It is not beyond the scope of normal human behavior and experience to imagine one's self in the shoes of a crime victim, and it is not inconceivable that many, if not all, of the jurors in this case, in viewing the evidence adduced at trial, took into account the emotions experienced by the victim prior to his death in rendering their verdict and penalty recommendation. We cannot view the prosecutor's argument in any vein other than as an appeal to the jury to apply their general knowledge and experience to the evidence adduced at trial before rendering their recommendation, and we are hereby unwilling to establish a rule which would per se prohibit the state from asking jurors to place themselves in the shoes of the victim. While it is the function of this court to ensure that criminal defendants do not fall prey to a "lynch mob" mentality, we cannot expect jurors to be cold machines devoid of human emotion. We are of the opinion that the prosecutor's request was sufficiently confined to the evidence and any permissible inferences which could have been fairly drawn therefrom within the meaning of La. C.Cr.P. art. 774. We are likewise of the

**6.** In *Chandler v. State*, 689 S.W.2d 332, 334 (Tex.App.-Fort Worth 1985, pet. ref'd), the court made the blanket assertion that "[i]t is improper in argument for a prosecutor to ask members of the jury to place themselves in the shoes of the victim."

**7.** The prosecuting attorney made the following argument:

Think of the fear that was then present for a man that was going to see his wife, but then he's a victim of a crime. Watch Mr. Austin get in the car, being shoved in. Watch him being held down. Feel what he felt from the evidence from being held in place with people on both sides, armed with weapons, seeing help just a little bit away, the Deputy Sheriff's car, without being able to call out and not being able to get a message off.... Continue on for approximately three more miles to the scene at Burma Road. Held in the back seat. Feel the thoughts. Feel the feelings. All I have is four kids and a wife that I want to go home to. I never asked for this. The car stops, he's pushed out, walked out ... Mr. Austin is not here to tell us what happened, but we know one thing. He's shot in the back. Shot in the back and left to die by bleeding to death.

Death isn't pretty. It wasn't pretty that night at the scene when I walked up there, but I'm asking you to look at something because I don't know how close you looked at it, but as he lay there in the ditch, he has the face of death. The victim knew he was dying. Shot and bleeding to death from the gunshot wound administered to him by the defendant and his co-defendants. That's fear. That's pain. That's suffering.

*Id.* at 221.

view that the request did not inject into the penalty proceeding any undue passion, prejudice or other arbitrary factor which unfairly influenced the jury's recommendation that the defendant be sentenced to death.

*Id.* at 222.

Likewise, we find the argument made here was a reasonable deduction from the evidence and a proper plea for law enforcement.[8]

Moreover, even if we were to assume that the argument constituted error, such error would be harmless. The alleged error here does not rise to the level of constitutional error. *Martinez v. State,* 17 S.W.3d 677, 692 (Tex.Crim.App. 2000). In such cases, determining harm requires a balancing of the following factors: (1) severity of the misconduct (the magnitude of the prejudicial effect caused by the State's improper jury argument), (2) curative measures (the effectiveness of any cautionary instruction given by the trial court), and (3) certainty of conviction absent the misconduct (the strength of the evidence supporting the conviction). *Mosley v. State,* 983 S.W.2d 249, 259 (Tex. Crim.App.1998). Because the argument occurred during punishment, the third factor is accordingly modified. *Martinez,* 17 S.W.3d at 692–93.

We do not find the degree of misconduct, if any, to be so severe as to have had a prejudicial effect. The prosecutor's comments were but only a small portion of the State's argument at punishment. The prosecutor commented on the fact that there was nothing in appellant's background to explain his committing this crime—he had no history of drug or alcohol abuse, he came from a good home with no history of physical abuse, and he had supportive parents who tried to instill in him strong morals and values. The prosecutor further commented to the jurors that they should be concerned that appellant could be capable of such violence at age twenty. The prosecutor also recounted the brutality with which appellant committed the murder—ambushing Toro, shooting Toro in the back, and bragging about it. The jury assessed a sentence of thirty years, which is well within the punishment range of five to ninety-nine years or life for a first-degree-felony offense. TEX. PEN. CODE ANN. § 12.32 (Vernon 1994).

Thus, while we find the prosecutor's statement was a proper argument, even if we were to conclude otherwise, the error would be harmless. Appellant's fourth issue is overruled, and the judgment of the trial court is affirmed.

---

8. Because the prospect of jury nullification is always a possibility, a prosecutor does not err in making a plea for law enforcement at the guilt/innocence phase of the trial. *See, e.g., Mulder v. State,* 707 S.W.2d 908, 913 (Tex. Crim.App.1986); *Martinez v. State,* 826 S.W.2d 807, 808 (Tex.App.-Texarkana 1992, no pet.). However, the logical relevance of a plea for law enforcement is greatest at the punishment phase of the trial.