# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-05-00266-CR

**Raymond Joseph Fierro, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF COMAL COUNTY, 22ND JUDICIAL DISTRICT
### NO. CR2004-225, HONORABLE JACK H. ROBISON, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury convicted appellant Raymond Joseph Fierro of two counts of injury to a child and one count of injury to a child causing serious bodily injury. *See* Tex. Penal Code Ann. § 22.04(a)(1), (3) (West 2003). The jury assessed punishment at 10 years' confinement for the first and second counts and 75 years' confinement for the third. In five issues on appeal, Fierro contests the factual sufficiency of the evidence and alleges two evidentiary errors. We will affirm the district court's judgment.

## BACKGROUND

The jury heard evidence that on or around January 9 and January 12, 2004, Fierro injured eight-year-old C.M., the son of Fierro's girlfriend, Michelle May. The jury also heard

evidence that the January 9 incident resulted in serious injury to C.M.'s genital area and that both Fierro and May participated in the January 12 incident.[1]

The State called several witnesses to testify, including the victim, C.M.; Esmeralda Aleman, Vanessa Vargas, and Ricardo Garza, eyewitnesses to the alleged beating on January 12; and registered nurse Blanca Neaves and urologist Dr. James Mansel Harris, both of whom examined C.M.'s injuries.

Aleman testified that as she was driving past Fierro's house on the evening of January 12, she observed what she first thought were a man and a woman "beating up a dog." Upon closer examination, she realized that the people were beating a child. Aleman explained that the man was holding the child in a "headlock" and "had the child's head in between his legs . . . while the lady was spanking the child" with a belt. Aleman further testified that the "spanking" looked "vicious" and more like a "whipping," so she decided to call 911 from a convenience store.

Vargas was Fierro's next-door neighbor and also witnessed the January 12 incident. Vargas testified that she heard some sort of "slapping" sound while inside her house and decided to go outside to investigate. Once outside, she observed "[C.M.] getting whipped with a belt" by May while Fierro held C.M. between his legs. When the State asked Vargas if Fierro at any point stopped or prevented May from beating C.M., Vargas testified, "He didn't. He just let it happen." According to Vargas, at one point C.M. fell down, Fierro "picked him up," and May continued hitting C.M. As a result of what she saw, Vargas called 911.

---

[1] May was named as a co-defendant in Fierro's indictment.

Vargas's husband, Ricardo Garza, also testified to observing the January 12 incident. Additionally, Garza also testified that on the night of January 9, he walked over to Fierro's house to borrow some DVDs. Garza recounted that as he approached the house he saw C.M. standing naked on the porch. Garza testified that C.M. was crying and holding his genitals. C.M. told Garza that Fierro had hit him "because [he] told a lie." When C.M. moved his hands away from his genital area, Garza noticed that C.M.'s genitals were bleeding and "tearing." Garza testified that at this point Fierro came outside, handed C.M. some clothing, and told him to go inside. When Garza asked Fierro what was going on, Fierro replied, "Nothing," and went back inside. Two days later, Garza confronted Fierro about the incident, told him that he had seen blood, and asked him what was wrong with C.M. Fierro responded, "It was from playing football." Garza testified that Fierro said nothing else about the incident.

Officer David Schroeder was one of the police officers who responded to the 911 calls placed by Aleman and Vargas on January 12. Schroeder testified that when he entered Fierro's house with another officer, he located C.M. in the back bedroom. Schroeder explained that when C.M. saw the officers, C.M. ran to the other officer and "grabbed him in a desperate hug." Schroeder testified that C.M. appeared scared and nervous. When Schroeder asked C.M. to pull down his pants so that he could investigate the reported beating, Schroder noticed that C.M.'s backside was "bruised all over" and that C.M.'s penis was clearly "ripped or cut." Schroeder testified that when he asked C.M. what had happened, C.M. told him that "Raymond pulled his foreskin."

C.M. testified and identified Fierro as the man who hurt his "private area." C.M. testified that Fierro grabbed and pulled his "area" really hard with two fingers, and that this caused

3

his "area" to bleed. C.M. testified that this happened outside on Fierro's front porch when C.M. was naked. C.M. also explained that after Fierro hurt him he was sent inside to take a bath and then was sent back outside to stay in a doghouse. C.M. explained that this was the only time his "area" had been hurt and that no one else had ever hurt him there. C.M. further testified that on some night prior to January 12, Fierro spanked him using a belt with metal studs on it.

C.M. also recounted a night after this incident in which Fierro tied his arms and legs to C.M.'s bed, approached C.M. with a "little steak knife," and told him, "If you don't go to sleep I'm going to cut your area off."

Finally, C.M. testified that on the night the police arrived, he was taken to the hospital where he had to "get surgery on [his] private area." He testified that he needed to have stitches and that there was still scarring in the area.

Registered nurse Blanca Neaves worked in the emergency room on the night that C.M. was brought to the hospital by the police. Neaves observed bruising on C.M.'s head, chest, and upper back, and she noticed that "his lower back and buttocks were just black and blue." Neaves also testified that, based on the coloring of the bruises, some of the bruising looked new while some of it looked old: "There were red areas. There were purple areas. There were black areas. There were some that were fading, that were green, yellowish, which is the normal color process with skin that has been bruised and then is healing." When Neaves asked C.M. how he had received those injuries on his back, C.M. told her that "his mother had hit him with a belt."

When Neaves observed the injury to C.M.'s genitals, she asked him what had happened. According to Neaves, C.M. told her that "Ray tugged at [his] privates. Ray just yanked

it.  He's always yanking it."  When asked to describe the condition of C.M.'s genitals, Neaves explained, "He had a partial degloving of the penis, which indicates that there was a tear of the skin all the way around."  Neaves also explained that "degloving" means that "the skin has partially slid down the shaft of the penis."  Neaves testified that in her 27 years of nursing, she had never seen this type of injury.

Dr. James Mansel Harris, a urologist, was contacted by the emergency room physician on the night that C.M. was brought to the hospital.  Harris was called in to consult on C.M.'s injury and arrived at the hospital on the morning of January 13.  Harris examined C.M. at the hospital and testified that C.M. had a circumferential avulsion or tear around the shaft of his penis, bruises along the length of the penile skin, and bruising tracking down his scrotum.  Pictures of the injury to C.M.'s genital area were admitted into evidence.  Harris explained that based on the appearance of the wound, bruising, and scabbing present, the injury had probably occurred approximately four days earlier, on January 9.  Harris testified that, based on the amount of force required to cause the injury, the injury could not have been accidental or the result of a fall.  Harris also testified that the injury could not have been caused by someone swinging a belt at C.M.  Harris explained, however, that "one really hard yank" could cause the injury.  Harris further testified that the injury, if left untreated or improperly treated, could have caused gangrene or even death.

Harris also performed surgery on C.M.  Harris testified that he had to "excise" all the dead tissue and that the entire wound was "vigorously scrubbed" until there was no dead tissue remaining.  Finally, "the two margins of skin were sutured or sewed together."  When asked if there were any possible lingering effects of this injury, Harris testified that "[a]ll of the nerves of the skin

5

were severed, so [C.M.] has the potential of having sexual function problems" and that there was a possibility that C.M. would never be able to have intercourse.

Fierro called several witnesses to testify. Officer Craig Christopherson also investigated the incident on January 12 and testified that none of the witnesses that he interviewed told him that Fierro had placed C.M. in a headlock. CPS investigator Janet Williams testified that C.M. told her that both his mother and Fierro spanked him on the evening of January 12. On cross-examination, Williams testified that when she asked C.M. what happened to his penis, C.M. told her, "Ray yanked it. He yanked it really hard."

Fierro also called the co-defendant, Michelle May, to testify. May testified that she observed a wound to C.M.'s penis on January 10 that was "about a half inch in length" and "around the top of the base . . . not the underside but the top side." Fierro elicited no further testimony from May, and the State did not cross-examine her.

Fierro next called Dr. Madison Lowry, who also examined C.M. on January 13. When asked if C.M.'s injury could have been caused by someone pulling on his penis with two fingers, Lowry replied, "You'd have to pull pretty strong to do this. An adult male would be strong, especially if, you know, he was angry, out of control, perhaps. I don't know. I'm not sure exactly. I can't quantify how much force it would take to do this. I've never seen any injury like this." Lowry also speculated that it would be easier to "do this type of injury using more of the hand."

Finally, Fierro called C.M. and questioned him about a time when he fell out of a tree. Fierro was apparently trying to claim that C.M.'s injury was a result of a fall.

The State indicted Fierro on three counts of injury to a child. One count was based

on the incident on January 12 involving the co-defendant, and the other two counts involved the January 9 incidents in which Fierro hit C.M. with a belt and pulled on C.M.'s genitals. The jury convicted Fierro of all three counts and assessed punishment at 10 years' confinement for the January 12 incident, 10 years' confinement for hitting C.M. with a belt, and 75 years' confinement for the injury to C.M.'s genitals. This appeal followed.

## DISCUSSION

### Factual sufficiency

In his first three issues, Fierro contests the factual sufficiency of the evidence concerning each of the three counts for which he was convicted.

In a factual sufficiency review, we view the evidence in a neutral light and ask whether a jury was rationally justified in finding guilt beyond a reasonable doubt. *See Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006). We then determine whether the evidence supporting the verdict is so weak that the verdict is clearly wrong and manifestly unjust or whether the verdict is against the great weight and preponderance of the conflicting evidence. *Id*. at 415. We will not reverse a case on a factual sufficiency challenge unless we can say, with some objective basis in the record, that the great weight and preponderance of the evidence contradicts the jury's verdict. *Id*. at 417.

To support Fierro's conviction for injury to a child as charged in the first two counts of the indictment, the evidence must support a finding that he intentionally or knowingly caused bodily injury to C.M. Tex. Penal Code Ann. § 22.04(a)(3). "Bodily injury" means physical pain, illness, or any impairment of physical condition. *Id*. § 1.07(a)(8) (West Supp. 2006). To support

Fierro's conviction for injury to a child causing serious bodily as charged in the third count of the indictment, the evidence must support a finding that he intentionally or knowingly caused serious bodily injury to C.M. *Id*. § 22.04(a)(1). "Serious bodily injury" means bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ. *Id*. § 1.07(a)(46).

### Count I

In the first count of the indictment, Fierro was charged with intentionally or knowingly causing bodily injury to C.M. by striking C.M. with a belt on or about January 12. Although the evidence establishes that it was May and not Fierro who struck C.M. with a belt on the date in question, the jury was instructed on the law of parties. The law of parties provides that "[a] person is criminally responsible for an offense committed by the conduct of another if . . . acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids or attempts to aid the other person to commit the offense." Tex. Penal Code Ann. § 7.02(a)(2) (West 2003). "Evidence is sufficient to convict under the law of parties where the defendant is physically present at the commission of the offense and encourages its commission by words or other agreement." *Salinas v. State*, 163 S.W.3d 734, 739 (Tex. Crim. App. 2005).

The evidence supporting the jury's verdict consists of the testimony of three witnesses, Aleman, Vargas, and Garza, who testified to seeing Fierro hold C.M. between his legs while May "viciously" struck C.M. with a belt.[2]

---

[2] Fierro attacks Aleman's credibility by stating that she was illiterate and had her friend write her statement to the police for her. This fact does not negate Aleman's testimony regarding what she saw that evening. Fierro also attacks Garza's credibility by asserting that Garza had been convicted on an unrelated matter six days prior to giving his statement to the police. However, Garza's conviction is not a part of the record and was not considered by the jury.

8

The evidence contrary to the verdict consists of the following exchange between C.M. and Fierro's trial counsel involving the issue of whether Fierro placed C.M. in an actual "headlock":

Q: Did you ever tell anyone that Raymond had put your head between his legs when you were getting whipped out in the front yard that night, that he put your head down between his legs and held you like in a headlock?

A: No.

Q: Did that happen?

A: No.

Q: That didn't happen, did it? Never. And I mean, you were there. Right?

A: Yes.

Q: Okay. . . . I want to be sure that you know what I'm talking about, that he was holding you like this with your hiney [sic] toward that way, (Indicating) like, toward the jury, and that he had your head between his legs and was holding you like in a headlock. That never happened, did it?

A: No.

Thus, the jury was faced with conflicting testimony. However, the jury, as the sole judge of the weight and credibility given to witness testimony, was permitted to disbelieve the child's testimony and believe the testimony of the three adult eyewitnesses. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1974) ("The jury, in all cases, is the exclusive judge of the facts proved, and of the weight to be given to the testimony, . . ."); *Margraves v. State*, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000); *Perez v. State*, 113 S.W.3d 819, 838 (Tex. App.—Austin 2003, pet. ref'd).

Furthermore, even assuming that C.M.'s testimony is true and Fierro did not hold

9

C.M. in an actual "headlock" during the incident, the evidence nevertheless establishes Fierro's participation in the beating. In fact, Vargas testified that, at one point, C.M. fell down and Fierro picked him up and allowed May to continue hitting him. There is no contrary evidence on that point.

Considering all the evidence in a neutral light, we hold that the evidence is factually sufficient to support the jury's verdict on count one of the indictment. We overrule Fierro's first issue.

### Count II

In the second count of the indictment, Fierro was charged with intentionally or knowingly causing bodily injury to C.M. by striking him with a belt on or about January 9.

The evidence supporting the jury's verdict consists of: (1) C.M.'s testimony that Fierro hit him with a belt with metal studs on it on some night prior to January 12; (2) the medical testimony of Neaves, who indicated that the bruising on C.M.'s backside was consistent with both recent and older bruising; and (3) the testimony of CPS investigator Williams, who testified that C.M. told her that both Fierro and May spanked him.

The evidence contrary to the verdict consists of: (1) Williams's testimony that C.M. did not tell her that he was spanked by a metal belt with studs on it; and (2) Neaves's testimony that C.M. told her that May spanked him, but did not tell her that Fierro spanked him.

Again, the jury was presented with conflicting evidence. Reconciliation of any conflicts in the evidence is within the exclusive province of the jury. *Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996). The jury is free to accept or reject any or all of the evidence presented by either party. *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991). A rational

10

jury could accept C.M.'s testimony under oath that Fierro hit him with a belt and also infer that, for whatever reason, C.M. chose not to tell Williams and Neaves about everything that Fierro did to him.

Fierro also asserts that "the medical evidence does not support the victim's claims that he was struck with a belt with metal studs on it. The injuries he sustained on his body were more recent bruising." The record reflects otherwise. Neaves testified that the bruising on C.M.'s backside was consistent with both recent and older bruising, based on the different-colored bruises.[3] Fierro further asserts in his brief that the injuries C.M. sustained to his backside "did not show the pattern or deep bruising that would be consistent with an injury from metal studs." Again, we can find no support in the record for this assertion.

Considering all the evidence in a neutral light, we hold that the evidence is factually sufficient to support the jury's verdict on count two of the indictment. We overrule Fierro's second issue.

### Count III

In the third count of the indictment, Fierro was charged with intentionally and knowingly causing serious bodily injury to C.M. by pulling his genitals. C.M. testified that Fierro used his first and second fingers to pull on his penis and that this is what caused the skin to be removed. The medical evidence presented at trial clearly establishes the seriousness of this injury,

---

[3] We also note that January 13, the date the bruises were examined, was only four days removed from January 9, the date the offense allegedly occurred. No witness testified that the injury occurred at some time other than "on or about" January 9. It is well-settled law that, when the jury is given an "on or about" instruction, as the jury was here, the State need not prove that the event occurred on the exact date alleged in the indictment. The State may prove that an offense was committed before, on, or after the date alleged in the indictment, so long as the date is anterior to the presentment of the indictment and not barred by limitation. *Mireles v. State*, 901 S.W.2d 458, 459 (Tex. Crim. App. 1995); *Lane v. State*, 174 S.W.3d 376, 387 n.12 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd).

and Fierro does not dispute this evidence. Rather, he argues that it is "physically impossible or improbable" that this injury was caused by Fierro.

There is some support in the record for Fierro's assertion that it was "improbable" for Fierro to cause this injury. The State's medical expert, Dr. Harris, testified that such an injury is very rare, requires "severe traction force," and is usually the result of industrial accidents. Fierro's medical expert, Dr. Lowery, testified that it would be "easier" to cause this type of injury "using more of the hand" than just two fingers.

However, there is no support in the record for Fierro's assertion that it was "impossible" for Fierro to cause this type of injury. Dr. Harris testified that "one really hard yank" could cause the injury, and Dr. Lowery testified that an angry adult male could be strong enough to cause such an injury. The jury had already heard testimony concerning the effects of Fierro's other violent actions toward C.M. Thus, it was rational for the jury to accept the testimony of the medical experts that a person could cause such an injury and to infer from C.M.'s testimony that Fierro was capable of causing such an injury.

Fierro's theory at trial was that the injury was the result of two separate acts: May initially caused the injury by striking C.M. on his genitals with a belt, and Fierro inadvertently exacerbated the injury by trying to grab C.M. when C.M. fell off the porch on the night that he was naked. We can find no support in the record for this theory. In fact, Fierro's theory was at least partially refuted by the testimony of Dr. Harris, who testified that C.M.'s injury could not have been caused by either a fall or a strike from a belt. Furthermore, even assuming that Fierro's theory of causation could find support in the record, "it is a jury, not a reviewing court, that accepts or rejects reasonably equal competing theories of causation." *Goodman v. State*, 66 S.W.3d

12

283, 287 (Tex. Crim. App. 2001). The jury evidently believed the State's theory of the case and rejected Fierro's theory, and we find nothing irrational about the jury's decision.

Considering all the evidence in a neutral light, we hold that the evidence is factually sufficient to support the jury's verdict on count three of the indictment. We overrule Fierro's third issue.

**Evidence related to the co-defendant's punishment**

In his fourth issue, Fierro asserts that the district court abused its discretion in excluding evidence concerning the punishment received by Michelle May, the co-defendant. During the punishment phase of his trial, Fierro asked Mark Mault, an investigator with the Comal County District Attorney's Office, to explain "what happened to Michelle May with respect to the . . . injuries involving [C.M.]" Fierro was attempting to elicit testimony concerning the punishment May received for her role in the January 12 incident. The State objected to this question, and the district court sustained the objection.

We review a trial court's decision to admit or exclude evidence for abuse of discretion. *Shuffield v. State*, 189 S.W.3d 782, 793 (Tex. Crim. App. 2006). "A trial court abuses its discretion when its decision is so clearly wrong as to lie outside that zone within which reasonable persons might disagree." *McDonald v. State*, 179 S.W.3d 571, 576 (Tex. Crim. App. 2005).

In sustaining the State's objection, the district court relied on several cases cited by the State, including *Evans v. State*, 656 S.W.2d 65 (Tex. Crim. App. 1983). In *Evans*, the court of criminal appeals held that the punishment received by a co-defendant was not relevant to the issue

13

of what punishment the defendant should receive:

> We do not see how the conviction and punishment of a co-defendant could mitigate appellant's culpability in the crime. Each defendant should be judged by his own conduct and participation and by his own circumstances. . . . We do not believe this is what the right to present mitigating circumstances to the jury was meant to include. The law contemplates evidence personal to the accused, not comparisons with the convictions and punishments of other defendants.

*Id*. at 67.

The district court also relied on *Walker v. State*, 530 S.W.2d 572 (Tex. Crim. App. 1975), in which the court of criminal appeals held that "upon the trial of one charged with crime it is not permissible to show that another jointly or separately indicted for the same offense has been convicted or acquitted." *Id*. at 573.

Fierro attempts to distinguish the above cases by asserting that they only apply to situations in which the co-defendant did not testify at trial. *See, e.g.*, *Rodriguez v. State*, 552 S.W.2d 451, 456 (Tex. Crim. App. 1977) (holding that trial court properly refused to let defense counsel introduce disposition of prosecution against co-defendants because "[n]one of the co-defendants were called as witnesses by the State"). Fierro claims that in his case, the co-defendant did testify. However, although May did testify briefly during the guilt/innocence phase of Fierro's trial, she was called as a defense witness. May was never called to testify for the State during either guilt/innocence or punishment, and the State did not cross-examine May when Fierro called her. Because May did not testify for the State, the cases relied upon by the State and the district court are applicable here.

We conclude that the district court, by following established legal precedent, did not abuse its discretion in excluding evidence related to the punishment that the co-defendant received. *See, e.g.*, *Torres v. State*, 92 S.W.3d 911, 918 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd) ("The disposition of a codefendant's case is generally not admissible in the trial of another codefendant."); *Montoya v. State*, 65 S.W.3d 111, 114-15 (Tex. App.—Amarillo 2000, no pet.) ("Generally, the disposition of a case against a co-defendant is inadmissible at trial against another co-defendant."); *Beasley v. State*, 838 S.W.2d 695, 703 (Tex. App.—Dallas 1992, pet. ref'd) ("Ordinarily, the disposition of a case against codefendants never becomes admissible in the trial of another codefendant.").[4] We overrule Fierro's fourth issue.

**Evidence related to the victim's alleged prior false accusation**

In his fifth issue, Fierro contends that the district court abused its discretion by excluding evidence of "previous false allegations" made by C.M. Twice during C.M.'s testimony, Fierro attempted to introduce evidence of an incident in which C.M. had made an allegedly false accusation that somebody had put a cigarette burn on his arm. The State objected to this evidence and the district court sustained the objection, stating that it was improper impeachment on a collateral matter.

"Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness'[s] credibility, other than conviction of crime as provided in Rule 609, may not be inquired into on cross-examination of the witness nor proved by extrinsic evidence." Tex. R. Evid. 608(b). There are three recognized exceptions to this rule: (1) to expose bias; (2) to

---

[4] *See also Hernandez v. State*, No. 03-03-00758-CR, 2004 Tex. App. LEXIS 8448, at *7 (Tex. App.—Austin Sept. 23, 2004, no pet.) (mem. op.)(not designated for publication).

correct any affirmative misrepresentations made on direct examination; or (3) to demonstrate a lack of capacity. *See Lagrone v. State*, 942 S.W.2d 602, 613 (Tex. Crim. App. 1997). Additionally, "the Confrontation Clause occasionally may require the admissibility of evidence that the Rules of Evidence would exclude." *Lopez v. State*, 18 S.W.3d 220, 225 (Tex. Crim. App. 2000). Relying solely on *Lopez* and *Carroll v. State*, 916 S.W.2d 494 (Tex. Crim. App. 1996), Fierro claims that the district court violated the Confrontation Clause by excluding the evidence of C.M.'s prior accusation. Neither case supports Fierro's position.

In *Lopez*, the court of criminal appeals held that, absent proof that the prior accusation was false or that the two accusations were similar, the evidence of the prior accusation should not be admitted because the probative value of the prior accusation is low while the risk that its admission would confuse the jury is high. 18 S.W.3d at 226. The conditions identified in *Lopez* are not present here. There is no proof in the record that C.M.'s prior accusation was false or that it was similar in nature to the offenses for which Fierro was charged.[5]

In *Carroll*, the court of criminal appeals held that a pending criminal charge against the witness is an appropriate area of cross-examination. 916 S.W.2d at 499. However, the evidence that the district court excluded in this case does not involve a pending criminal charge against C.M.

Fierro has not made a showing that the exclusion of the evidence violated the Confrontation Clause or that the evidence falls under one of the recognized exceptions to rule

---

[5] The State asserted at trial and in its brief that a CPS investigation determined that the prior injury to C.M. was the result of an insect bite rather than a cigarette burn and that C.M. never claimed otherwise. However, because the CPS report concerning this incident does not appear in the record, we cannot determine the nature of either the injury or the alleged false accusation.

608(b).  Absent such a showing, we hold that the district court did not abuse its discretion in excluding the evidence.  We overrule Fierro's fifth issue.

## CONCLUSION

Having overruled Fierro's issues on appeal, we affirm the judgment of the district court.[6]

_____

Bob Pemberton, Justice

Before Chief Justice Law, Justices Patterson and Pemberton

Affirmed

Filed:   March 22, 2007

Do Not Publish

---

[6] Fierro has also filed a motion to terminate his counsel's representation and proceed pro se, an "Emergency Unapposed [sic] Motion to Suspend Texas Rules of Appellate Procedure Rule 9.3(b)," and an "Emergency Unapposed [sic] Motion to Correct and Clarify Statement of Facts and Resolve All Defects and Omissions in Reporter's Record."  However, no motion to withdraw has been filed by Fierro's court-appointed attorney, and Fierro has no right to hybrid representation. *See Patrick v. State*, 906 S.W.2d 481, 498 (Tex. Crim. App. 1995); *see also Ex parte Thomas*, 906 S.W.2d 22, 24 (Tex. Crim. App. 1995) ("The right of self-representation is not a license to capriciously upset the appellate timetable or to thwart the orderly and fair administration of justice.").  Therefore, we overrule Fierro's pro se motions.

17