**MODIFY, REFORM, and AFFIRM;  Opinion Filed July 1, 2016.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-14-01419-CR

### TERRY RAY MCMILLAN, Appellant
### V.
### THE STATE OF TEXAS, Appellee

**On Appeal from the 265th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F-0550140-UR**

## MEMORANDUM OPINION
Before Justices Bridges, Lang-Miers, and Schenck
Opinion by Justice Bridges

Terry Ray McMillan appeals his murder conviction.[1]  A jury convicted appellant and sentenced him to forty years' confinement.  In ten points of error, appellant argues the evidence is legally insufficient to support his murder conviction, the evidence will support a manslaughter conviction, he is entitled to a new trial because a critical exhibit was destroyed through no fault of his own, the trial court abused its discretion in denying his motion for mistrial following the prosecutor's repeated questioning of appellant concerning an extraneous offense, the trial court erred by not holding a hearing on his motion for new trial, the trial court erred in overruling defense counsel's objections to certain jury arguments and motion for mistrial at punishment,

---

[1] The record contains the State's notice that evidence of the following offenses could be introduced at trial: unauthorized use of a motor vehicle, delivery of a controlled substance, three possession of marijuana offenses, evading arrest, aggravated assault, assault, and "Defendant's status as a pimp" "Prior to, In and Around the time of" the murder in this case.

and the judgment should be modified to reflect the correct names of the trial prosecutors. As modified, we affirm the trial court's judgment.

At approximately 3:00 a.m. on March 2, 2005[2], Dallas police officer Christopher Walton responded to a shooting call at an apartment complex in Dallas. It was raining, and Walton encountered an "emotional crowd" of about fifty people at the scene. Paramedics were working on a shooting victim when Walton arrived. A witness to the shooting, Alexia Davis, approached Walton. Alexia was "very emotional" and "hysterical," but she was able to give Walton a description of the shooter. Walton later relayed the description to Dallas police detective Marvin Ned. Walton also spoke to Robert Jones, who had been shot in the hand but also gave a description of the shooter. After the shooting victim was transported to the hospital, Walton spoke to John Calhoun, the victim's brother. John also gave Walton a description of the shooter. Walton passed on all the information he gathered to Ned.

Ned was appointed lead detective on the case, and he went to the hospital to talk to witnesses and sent three other detectives to the crime scene. When Ned arrived at the hospital, the victim, Charles Calhoun, was dead. Ned learned that some of the witnesses were cousins of the victim, and John was Calhoun's brother. Ned then went to the crime scene, where he also spoke to witnesses, and the other detectives searched Calhoun's apartment for weapons but found none. However, detectives recovered two spent .45 caliber shell casings at the scene of the shooting. From speaking to the witnesses, Ned was able to identify a suspect, appellant. Ned showed a photographic lineup to multiple witnesses, who identified appellant as the man who shot Calhoun.

Appellant was indicted for Calhoun's murder. At trial, Alexia testified she went to Calhoun's apartment about 10:00 p.m. on March 2, 2005 with Robert, Ida Jones, and Tony

---

[2] After the Texas Court of Criminal Appeals granted appellant an out-of-time appeal, appellant timely filed his notice of appeal.

Hoyle.  John and Calhoun were at the apartment along with a woman named Catherine.  Tony and Catherine stayed at the apartment while everyone else went to a "strip bar."  At approximately 2:00 a.m., the group left the bar.  Alexia and the others were riding in Calhoun's car when a white Impala pulled up next to them, and Calhoun stopped to speak with the driver, appellant.  Calhoun knew appellant "from back in the past" and invited appellant to come back to the apartment.  When they had all returned to the apartment, two men Alexia did not know arrived.  An argument ensued between Calhoun, appellant, and Catherine.  Alexia thought the argument involved Calhoun telling appellant "that he couldn't come in and try to take Robert's female."  Calhoun told appellant, "You can't come in and take another female from another person's house," and they "kind of got mad at each other" but "cooled it off" afterward.  Alexia did not think the argument was serious.

At some point, Alexia saw Calhoun go outside.  Alexia was sitting on a couch when she heard a gunshot.  She went outside and saw appellant "standing over [Calhoun] with the gun."  Alexia saw Calhoun "bent over like he was holding" himself on "the lower part of his stomach."  "Another gunshot went off," and Calhoun fell to the ground.  Alexia saw appellant holding a gun and firing the second shot at Calhoun.  Alexia thought the second shot hit Calhoun because "the first shot, [Calhoun] was kind of standing up, and the second shot made him fall to the ground."  Alexia did not see any objects in Calhoun's hands, and she did not see anyone else with a gun.  Alexia heard "some more gunshots," she "yelled to [John] and Robert that someone was "shooting your brother and your cousin," and "just about everybody came out" of the apartment.  Appellant continued shooting, hitting Robert in his hand, before driving away.  After the shooting, Alexia did not see anyone take anything away from Calhoun or the scene of the shooting.

Robert, Calhoun's cousin, testified Calhoun was living with him at the apartment on March 2, 2005. On the night of the shooting, Robert went to the club where he "walked up on" a conversation Calhoun was having with appellant. Appellant said he had a car for sale, Robert said he needed a car, and appellant gave Robert his phone number. After Robert, Calhoun, and the others left the club, appellant followed them to Robert's apartment. Back at the apartment, appellant "called someone," and "two guys" showed up. An argument began between Calhoun and appellant that "had something to do with the girl that was there, Catherine." The argument did not appear serious, and Robert did not see any physical confrontation. The argument "kind of blew off," and Calhoun sat back down on the couch. Robert was in the back bedroom when he heard gunshots. Robert looked out the window and saw Calhoun on the ground and appellant "standing right by [Calhoun] with a gun in his hand" less than twenty feet away. Appellant's gun was a "chrome" handgun "bigger than a .25." Robert ran outside, and appellant "turned and fired" at Robert and "at everybody that was up on the porch." Robert was hit in the hand, and he dove back inside the apartment. Robert "heard the car pull off real fast" and ran outside to where Calhoun was lying on the ground. "It sounded like [Calhoun] was breathing but he was snoring . . . like he was asleep."

John, Calhoun's brother, testified he lived with Calhoun and Robert at the time of the shooting. On the night of the shooting, John accompanied Calhoun and the others to the Under the Bridge Club. As the group was leaving in Calhoun's car, an Impala "swerved in front of" Calhoun. Calhoun recognized appellant as the driver of the Impala, and he honked at appellant. Appellant stopped, Calhoun asked him what was up, and appellant said he was going to an after-hours club. Calhoun said he was going to drop some of his passengers off at the apartment and told appellant to follow him. Back at the apartment, appellant came inside, and two men John did not recognize arrived about five minutes later. Catherine came out of the back room, and

appellant "inquired about her." Charles told appellant Catherine was a prostitute but she was his "cousin's girl." Appellant asked if Robert was "putting her out on the street" and said "if she ain't out there, she ain't making no money." Appellant and Calhoun argued about Catherine until John broke up the argument. John ushered appellant and the two men outside and apologized for "things going the wrong way." John made it clear that Calhoun was "not going nowhere" and indicated appellant should go on his way. Appellant did not leave but went to his car, and John went back inside the apartment. At that point, Calhoun was sitting on the arm of the couch, and Catherine was outside talking to appellant. Catherine came back inside to get her belongings, and John followed her into the back room. Standing in the doorway of the back room, John turned around and saw Calhoun outside on the porch. John turned back around and heard gunshots from outside. Someone said, "He just shot your brother," and John ran outside. John saw appellant standing over Calhoun. Appellant had a chrome handgun in his hand. John said, "Don't shoot my brother no more, man," and appellant said, "Get back" and started shooting. John "ran back up in the breezeway," and appellant drove away. John ran back to Calhoun, who was lying on the ground. John never saw Calhoun with a gun on March 2, 2005.

Appellant testified he went to the Under the Bridge Club at 12:45 a.m. on March 2, 2005. Appellant saw Calhoun at the club, and they spoke briefly about "how everything [had] been going." Appellant and Calhoun were not friends, but they had known each other for about a year and a half. As appellant was leaving the club, Calhoun pulled up in his car and invited appellant to his house. Calhoun said he had "a few ladies in the car and a few ladies at the house, and they down for whatever." Appellant followed Calhoun to his apartment. While he was driving, appellant called a friend, "Silk," and told him about what Calhoun had said. Silk's real name was Charles Brown, and appellant testified "the last [he] heard, he was in California." After

arriving at Calhoun's apartment, appellant remained on the phone with Silk and told him the apartment's location.

Appellant went inside the apartment and saw that everyone was talking and drinking. Appellant proposed that everyone accompany him to an after- hours club, and appellant offered to "pay for the drinks and for the entryway." Appellant used the restroom, which was accessible through a back bedroom. When appellant came out, he saw Catherine and John talking in the bedroom. Catherine was "talking about she wanted to go to the after hour," and "John was upset with her because she was trying to leave." Appellant asked John why it was a problem that Catherine wanted to leave, and John told appellant to "stay out of his business."

Appellant went out into the living room, and his friend Silk arrived with another man, "Ceelo."[3] Appellant introduced Silk and Ceelo to the group of "at least a dozen" people in the apartment. Silk and Ceelo both said they knew Catherine, and they spoke with her. Calhoun approached and said, "we ain't going to the after hour, man." Calhoun's demeanor was "kind of arrogant a little bit," and appellant responded that he "could have been gone," and "y'all waste my time sitting and waiting on y'all." Appellant asked, "What about the ladies?" and Calhoun said, "They ain't going nowhere neither." Appellant gave Catherine his telephone number and left the apartment with Silk and Ceelo.

Appellant got in his car, and Silk and Ceelo got in their car parked behind appellant, pulled into the street next to appellant's car, and stopped there. Catherine came out of the apartment and tried to "flag [appellant's] car down." Catherine came up to appellant's car and said she "wanted to go." Appellant said she could "ride if she wanted to," and Catherine got in the passenger side of appellant's car. Catherine said, "They in there tripping." As appellant was about to drive away, Calhoun "ran out and jumped in front of [appellant's] car." According to

---

[3] Appellant testified he did not know "Ceelo's" true name.

appellant, Calhoun "appeared to have something" and "had his hand behind his back the whole time while [appellant] was speaking to him." Appellant had a gun in the console of the car seat, and he put the gun on the seat when he first saw Calhoun in front of the car. Appellant got the gun from a friend and had it for about a week.

Calhoun said, "Let this bitch up out this car. This bitch ain't going nowhere." Appellant asked Catherine to "go ahead and get out because [he] didn't want no trouble." Appellant had "known [Calhoun] to have a gun on him," and appellant thought Calhoun might have a gun as Calhoun stood with his hand behind his back in front of the car. Catherine got out of the car, and appellant directed her to walk around the car and around to the sidewalk. Appellant saw John was also outside and noticed Catherine had appellant's telephone. Appellant "pulled up just a hair" onto the sidewalk and asked Calhoun "What's going on, man?" Calhoun answered, "Nothing going on. This bitch just ain't fixing to go anywhere." Appellant asked if he could get his phone and "stood out the car." John "snatched the phone away from" Catherine, slapped her and told her to get in the house, and threw the phone to appellant. Appellant bent down to get his phone, and Calhoun "came up running back with a gun" and said, "You can take this with you too." Calhoun "reached around like with his gun," and appellant heard a shot. Appellant "ducked down and picked up [his] gun" and "shot twice and jumped in the car." Appellant fired his gun because Calhoun "had fired his gun, and [appellant] was in fear whether or not [Calhoun was] going to shoot [appellant] or not." At the time, "a lot of people" were outside: Calhoun, John, Robert, and "some people standing back like on the porch." Appellant drove away and heard "about three more shots." The next morning, appellant checked the car he was driving, which was borrowed, and found Calhoun's shot had gone into the side of the door. Appellant returned the gun and the car to their owners. About three weeks later, appellant learned Calhoun had been killed.

Catherine testified she was living at the apartment with Robert on March 2, 2005. At that time, Catherine was working as a prostitute. Catherine was asleep when John woke her up and told her to come to the living room. Appellant came in the room and said to Catherine, "Oh, this is who y'all was talking about?" Appellant followed Catherine to a back room where Catherine was going to change to go to an after-hours club. Catherine asked to use appellant's phone so that she could call her mother to pick her up because appellant, Silk, and Ceelo were "pimping at" her and trying to get her to "prostitute for them." At some point, Catherine went outside where she was trying to call her mother. Silk and Ceelo were in their car, and appellant and Catherine were "standing out." Calhoun walked over and started arguing with appellant. Catherine did not see a gun in Calhoun's possession. Catherine did not know what they were arguing about and "just heard them cussing." As Catherine went back inside the apartment after giving appellant his phone, she heard gunshots. Catherine heard somebody yell, "They done shot my brother," and she saw Robert run outside.

David Spence, supervisor of the trace evidence section at the Southwestern Institute of Forensic Sciences (SWIFS) testified he reviewed the gunshot residue kit collected from Calhoun's hands. Spence testified the hand wipings taken from Calhoun did not show any primer gunshot residue particles, which meant that Calhoun did not discharge a firearm, discharged a firearm that did not deposit significant quantities of residue particles on the hands, or washed or wiped his hands after firing a weapon. Spence also examined Calhoun's clothes and determined he was shot from a distance of between six inches to three feet.

Raymond Cooper, a firearm and tool mark examiner at SWIFS, testified the two .45 caliber shell casings recovered from the scene of the shooting were fired by the same weapon. Dr. Jill Urban, a medical examiner at SWIFS, testified she performed an autopsy on Calhoun. Urban testified Calhoun had a gunshot wound in the "left upper quadrant of the abdomen." The

bullet "went from his front to his back, downward through his body, and very slightly from his left side to his right side." Urban determined the cause of Calhoun's death was a gunshot wound to the abdomen.

The jury charge instructed the jury on the law of self defense and required the jury to find appellant not guilty if it found he acted in self defense. The charge permitted the jury to convict appellant of murder or manslaughter or acquit him. The jury found appellant guilty of murder, and this appeal followed.

## SUFFICIENCY AND SELF DEFENSE

In his first point of error, appellant argues the State failed in its burden of persuasion to refute appellant's proof of selfdefense. Thus, appellant argues, the evidence is legally insufficient to support his murder conviction. In his second point of error, appellant makes the related argument that, the evidence being insufficient to prove murder, the evidence was sufficient to show appellant committed manslaughter.

When reviewing the legal sufficiency of the evidence, we examine all of the evidence in the light most favorable to the verdict and determine whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013). Although we consider everything presented at trial, we do not reevaluate the weight and credibility of the evidence or substitute our judgment for that of the fact finder. *See Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). Because the jury is the sole judge of the credibility of witnesses and of the weight given to their testimony, any conflicts or inconsistencies in the evidence are resolved in favor of the verdict. *See Wesbrook v. State*, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000). Our review includes both properly and improperly admitted evidence. *See Clayton v. State*, 235 S.W.3d 772, 778 (Tex.

Crim. App. 2007). We also consider both direct and circumstantial evidence, as well as any reasonable inferences that may be drawn from the evidence. *Id.*

A person commits murder if he intentionally or knowingly causes the death of an individual or if he intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. TEX. PENAL CODE ANN. § 19.02(b)(1), (2) (West 2011). A person commits manslaughter if he recklessly causes the death of an individual. *Id.* § 19.04(a).

The penal code distinguishes between ordinary and deadly force used in self-defense. *See id.* §§ 9.31, 9.32. Regarding ordinary force, § 9.31 provides that "a person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." *Id.* § 9.31(a).On the other hand, § 9.32 provides that "a person is justified in using deadly force against another if the actor would be justified in using force against another under section 9.31 and when and to the degree the actor reasonably believes the deadly force is immediately necessary to protect the actor against the other's use or attempted use of unlawful deadly force." *Id.* § 9.32(a)(1), (2)(A). Deadly force is "force that is intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury." *Id.* § 9.01.

Appellant argues the testimony of the State's witnesses was inconsistent, while appellant's own testimony that Calhoun had a gun and tried to stop him from leaving was "clear and unequivocal." Even if Calhoun did not have a gun, appellant argues he had known Calhoun to have a gun in the past, and Calhoun held his hand behind his back, causing appellant to believe he had a gun. Appellant points out Calhoun was only shot once, which indicates appellant "was not aiming at [Calhoun], intending to kill him, or even to cause him serious

–10–

bodily injury." Instead, appellant argues, he was merely "reckless" in discharging his firearm in Calhoun's direction. Appellant concedes there was no gunshot residue on Calhoun's hands, but he points out is was raining very hard when police arrived at the scene of the shooting. Appellant argues there was no evidence of a motive for him to shoot Calhoun unless he was in fear for his life. Thus, appellant argues, the State failed to refute appellant's proof of self defense, and the evidence was therefore insufficient to support a murder conviction. In the alternative, appellant argues that he was acted only recklessly, requiring this Court to reform the judgment to reflect an acquittal for murder and a conviction for the lesser included offense of manslaughter.

Here, Alexia testified she saw appellant fire a second shot at Calhoun and saw Calhoun fall to the ground. Calhoun did not have a weapon or anything else in his hands. No weapon was recovered from the scene, and no testimony other than appellant's placed a gun in Calhoun's hand. The evidence shows appellant shot at the other witnesses present and hit Robert in the hand after he shot Calhoun. The fact that Calhoun was only hit once just shows that appellant missed with his second shot. Proof of motive is not a required element in criminal cases. *Sandoval v. State*, 409 S.W.3d 259, 298 (Tex. Crim. App. 2013). However, the evidence showed Calhoun thwarted appellant's attempt to convince Catherine to "prostitute" for him. The jury was free to judge appellant's credibility as a witness, disbelieve his testimony that he was acting in self defense, and believe the testimony of Alexia and other witnesses that Calhoun was unarmed when appellant shot him and then turned his gun on the other witnesses, wounding Robert in the hand. *See Williams*, 235 S.W.3d at 750; *Wesbrook*, 29 S.W.3d at 111. Under these circumstances, we conclude the evidence was sufficient to refute appellant's self-defense theory and establish appellant acted knowingly or recklessly when he shot Calhoun. *See Temple*, 390 S.W.3d at 360. Thus, the evidence was legally sufficient to support appellant's murder

–11–

conviction. *See id.* Accordingly, we need not address whether appellant would support a conviction for manslaughter. We overrule appellant's first and second points of error.

### NEW TRIAL BASED ON MISSING EXHIBIT

In his third point of error, appellant argues he is entitled to a new trial because an exhibit was destroyed through no fault of his own. Specifically, appellant complains of the destruction of State's Exhibit 23, a blown up photograph of State's Exhibit 21, a photograph of the outside of the apartment. Appellant points out this exhibit was used by witnesses as a "map" to indicate the position of witnesses in relation to Calhoun and appellant at the time of the shooting. Several witnesses placed initials on the exhibit, and the State showed the exhibit to the jury during its argument. Appellant argues it is "virtually impossible to ascertain the location of the parties at the time of the shooting in the absence of State's Exhibit 23."

Texas Rule of Appellate Procedure 34.6(f) provides that an appellant is entitled to a new trial if a significant and necessary part of the reporter's record is lost or destroyed through no fault of her own, the appellant timely requested the record, and the parties cannot agree to the record. TEX. R. APP. P. 34.6(f). The requirement that the missing record be necessary to the appeal was meant to mitigate against the harshness of a rule that might require a new trial even when no error actually occurred in the proceedings. *Nava v. State*, 415 S.W.3d 289, 306 (Tex. Crim. App. 2013). "The provision in the rule that the appellant show that the missing portion of the record is necessary to her appeal is itself a harm analysis." *Id.* (quoting *Routier v. State*, 112 S.W.3d 554, 571 (Tex. Crim. App. 2003)). When an appellant has not been harmed by the missing portion of the record, he should not be granted relief. *Id.*

Here, only Alexia saw appellant fire a shot at Calhoun. The record contains her testimony that she saw Calhoun "bent over like he was holding" himself on "the lower part of his stomach." "Another gunshot went off," and Calhoun fell to the ground. Alexia saw appellant

holding a gun and firing the second shot at Calhoun. Robert and John saw appellant shooting at the witnesses, and Robert was shot in the hand. The record contains an unenlarged copy of the photograph at issue. We have already concluded the evidence was sufficient to show appellant committed murder. We conclude under the circumstances that the blown up photograph bearing witness initials was not necessary to the appeal, and appellant was not harmed by its destruction. *See id.* We overrule appellant's third point of error.

## MISTRIAL FOR IMPROPER QUESTIONING OF EXTRANEOUS CRIMINAL CONDUCT

In his fourth and fifth points of error, appellant argues the trial court abused its discretion in denying appellant's motion for mistrial following initial and repeated questioning of appellant regarding an extraneous offense of drug dealing.

When, as here, the trial court sustains a defense objection and instructs the jury to disregard, but denies a defendant's motion for mistrial, the issue is whether the trial court abused its discretion by denying the mistrial. *Hawkins v. State*, 135 S.W.3d 72, 76-77 (Tex. Crim. App. 2004); *see also Coble v. State*, 330 S.W.3d 253, 292 (Tex. Crim. App. 2010). We uphold the trial court's ruling if it was within the zone of reasonable disagreement. *Coble*, 330 S.W.3d at 292. "Only in extreme circumstances, where the prejudice is incurable, will a mistrial be required." *Hawkins*, 135 S.W.3d at 77; *see also Ocon v. State*, 284 S.W.3d 880, 884–85 (Tex. Crim. App. 2009) (mistrial is extreme remedy and should be granted only when residual prejudice remains after less drastic alternatives are explored). Granting a mistrial is appropriate when error is "so prejudicial that expenditure of further time and expense would be wasteful and futile." *Hawkins*, 135 S.W.3d at 77 (quoting *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999)).

"The asking of an improper question will seldom call for a mistrial, because, in most cases, any harm can be cured by an instruction to disregard." *Wood v. State*, 18 S.W.3d 642, 648 (Tex. Crim. App. 2000) (quoting *Ladd*, 3 S.W.3d at 567). "On appeal, we generally presume the jury follows the trial court's instructions in the manner presented. The presumption is refutable, but the appellant must rebut the presumption by pointing to evidence that the jury failed to follow the trial court's instructions." *Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005); *see also Wood*, 18 S.W.3d at 648 ("A mistrial is required only when the improper question is clearly prejudicial to the defendant and is of such character as to suggest the impossibility of withdrawing the impression produced on the minds of the jurors.") (quoting *Ladd*, 3 S.W.3d at 567); *Ovalle v. State*, 13 S.W.3d 774, 783 (Tex. Crim. App. 2000) (prompt instruction to disregard will ordinarily cure any prejudice associated with improper question and answer, even one regarding extraneous offenses).

Although our review of the denial of a mistrial involves determining whether error occurred, our consideration involves most, if not all, of the same factors that attend a harm analysis. *See Archie v. State*, 221 S.W.3d 695, 699-700 (Tex. Crim. App. 2007) (citing *Hawkins*, 135 S.W.3d at 77). To determine whether a trial court abused its discretion by denying a mistrial, we apply the test articulated in *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998), which requires balancing of three factors: (1) severity of the misconduct (magnitude of the prejudicial effect of the prosecutor's remarks); (2) measures adopted to cure any harm from the misconduct (efficacy of any cautionary instruction by the trial court); and (3) certainty of conviction absent the misconduct (strength of the evidence supporting the conviction).

Here, the prosecutor asked appellant what kind of a job he had, and appellant answered that he was "hustling." The prosecutor asked what that meant, and appellant said, "Hustling by any means. Maybe you can be hustling as far as like selling weed or maybe anything, gambling,

things of that nature." The prosecutor asked what else appellant was doing to get money. Defense counsel objected "to the relevance," and the trial court sustained the objection. The prosecutor pointed out appellant was "driving around in a '93 Lexus" and offering to pay entrance fees to an after-hours club and buy drinks. The prosecutor asked where he got the money. Appellant answered, "I was hustling, ma'am." The prosecutor said, "You were hustling. You're a drug dealer, you gamble?" Defense counsel objected, and the trial court sustained the objection, instructed the jury to disregard, but denied counsel's motion for mistrial. The prosecutor asked appellant, "You were selling weed?" Appellant answered, "Yes, ma'am." The prosecutor stated, "That's what you said," and defense counsel again objected. The trial court again sustained the objection, instructed the jury to disregard, and denied appellant's motion for mistrial.

The prosecutor in this case asked appellant whether he was a drug dealer and whether he gambled after appellant testified he was "hustling," and that included "selling weed" and "gambling." The prejudicial effect of the prosecutor's attempt to clarify appellant's testimony was slight and followed appellant's own testimony that he engaged in activity that could include "selling weed." The trial court instructed the jury to disregard, which instruction we presume the jury followed. *Thrift*, 176 S.W.3d at 224. Without any reference to appellant's "hustling" or status as a "drug dealer," the evidence presented included eyewitness testimony of appellant shooting at Calhoun, who died from a gunshot wound. Under these circumstances, we conclude the trial court did not abuse its discretion in denying appellant's motion for mistrial. *See Hawkins*, 135 S.W.3d at 76-77. We overrule appellant's fourth and fifth points of error.

In his sixth point of error, appellant complains the trial court erred in not holding a hearing on his motion for new trial. When examining a trial court's denial of a hearing on a motion for new trial, we review for an abuse of discretion. *Smith v. State*, 286 S.W.3d 333, 340

–15–

(Tex. Crim. App. 2009). Our review is limited to the trial judge's determination of whether the defendant has raised grounds that are both undeterminable from the record and reasonable, meaning they could entitle the defendant to relief. *Id.* This is because the trial judge's discretion extends only to deciding whether these two requirements are satisfied. *Id.* If the trial judge finds that the defendant has met the criteria, he has no discretion to withhold a hearing. *Id.*

In his motion for new trial, appellant argued he received ineffective assistance of counsel, and newly discovered evidence could have changed the outcome of the trial. Specifically, he argued counsel failed to investigate and interview a potential defense witness named by appellant. The affidavit of this witness, Charles Alexander, was attached to the motion for new trial and constituted the "newly discovered evidence" to which the motion referred. According to Alexander's affidavit, Calhoun and appellant had a dispute because a "young lady" wanted to leave with appellant. Calhoun "began to repeatedly charge at [appellant] using profanities toward [appellant]." Alexander, "Mr. Brantly," and appellant were able to leave the apartment because Calhoun was restrained by "some Gentlemen inside the apartment." By the time Alexander and Brantly crossed the street to their car, the young lady came outside and talked to appellant. The affidavit described the shooting as follows:

> A few seconds or so Mr. Calhoun came outside yelling at [appellant] that he was going to get him. While backing up, [appellant] was asking Mr. Calhoun to back up himself and to leave him ([appellant]) alone as he did not want any trouble[;] however[,] Mr. Calhoun was still yelling that he was going to get ([appellant]). At some point, Mr. Calhoun jumped at [appellant] and then [appellant] shot Mr. Calhoun down low below the waist area. [Appellant] walked towards his car and then people came outside because they heard the gunshot. When they seen Mr. Calhoun on the ground in a sitting position they started yelling at [appellant], at this point [appellant] shot the gun into the air because the people started running at him yelling. As I stated [appellant] was backing up the whole time that Mr. Calhoun was telling him that he was going to get him and walking towards [appellant]. Once he shot the gun into the air everybody just stopped, and the three of us (Brantly, Myself and [appellant]) left.

The affidavit concluded with a statement that, if appellant's lawyer had "continued with the Bench Warrant procedure that I was called out for while in the California Penal System," this would have been his testimony.

In his brief, appellant does not argue the ineffective assistance claim and instead urges that this Court should abate this appeal, direct the trial court to obtain Alexander's presence, and hold a hearing on the new trial. However, it is not clear how trial counsel could have been ineffective for failing to interview a California inmate named "Charles Alexander" when appellant testified "Silk" was in California and his name was "Charles Brown." Further, appellant testified Calhoun had his hand behind his back and eventually revealed he had a gun in his hand which he fired at appellant before appellant shot back. Alexander's affidavit contradicts appellant's own testimony and alleges Calhoun "jumped at" appellant and appellant shot him. Alexander does not mention Calhoun having a gun or holding his hand behind his back. We conclude the grounds raised in appellant's motion for new trial would not have entitled him to relief. Accordingly, the trial court did not abuse its discretion in denying appellant's motion for new trial. *See id.* We overrule appellant's sixth point of error.

## MISTRIAL BASED ON CLAIMED IMPROPER JURY ARGUMENT

In his seventh, eighth, and ninth points of error, appellant argues the trial court erred in overruling his objections and motion for mistrial following improper jury argument at the punishment phase of trial. At punishment, the prosecutor said "we're not talking about this guy [appellant] any more" and made the following argument:

> What we are talking about now is this man. This is the man we're here to talk about now. Now we get to consider Charles Calhoun. Now we get to consider what effect not only has this man had on our community in the past and in the future, but the effect that it's had on this man. The effect it's had on this family. The effect that it's had on this mother who lost her son. That's what you guys get to consider now. The effect that it's had on this man who lost his brother. On these people who lost their cousin. You get to consider the fact that the last time that Ida Jones or Tony Hoyle saw their cousin alive, they were pumping on his

–17–

chest trying to get him to breathe again. Those are their last memories of this guy, of Charles Calhoun. You get to consider that now. You get to consider every single factor that's emotional and that goes to whether or not this man will walk on the street again with you and I and with everybody in this room. He can't take the stand and talk about what a good father he is. He can't take the stand and talk about the effect that it will have on his family and his children from here on out. He can't do it.

Defense counsel objected that this was "improper argument." The court asked the prosecutor to clarify "which he" the prosecutor referred to, and the prosecutor answered, "Charles Calhoun." The trial court overruled the objection. The prosecutor continued, "He can't speak for himself. You speak for him now. You speak for this community now. You speak for that family now." Defense counsel again objected. The trial court sustained the objection, instructed the jury to disregard, but denied counsel's motion for mistrial. The prosecutor discussed the punishment range being between life and fifteen years and asked the jury to "find a fair number." The prosecutor asked the jury to "find a number that reflects Charles Calhoun and his family." Defense counsel objected, and the trial court overruled the objection.

Proper jury argument generally falls within one of four general areas: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to argument of opposing counsel; and (4) plea for law enforcement. *Brown v. State*, 270 S.W.3d 564, 570 (Tex. Crim. App. 2008) (citing *Guidry v. State*, 9 S.W.3d 133, 154 (Tex. Crim. App. 1999)). "The arguments that go beyond these areas too often place before the jury unsworn, and most times believable, testimony of the attorney." *Brown*, 270 S.W.3d at 570 (quoting *Alejandro v. State*, 493 S.W.2d 230, 231 (Tex. Crim. App. 1973)). Consequently, error exists when facts not supported by the record are interjected in the argument, but such error is not reversible unless, in light of the record, the argument is extreme or manifestly improper. *Allridge v. State*, 762 S.W.2d 146, 155 (Tex. Crim. App. 1988).

While punishment, in our modern system of criminal justice, must be based upon the moral blameworthiness of the defendant (and not the victim's desire for revenge), the jury is still entitled to consider the full, unvarnished specter of the defendant's actions. *Torres v. State*, 92 S.W.3d 911, 921 (Tex.—App. Houston [14th Dist.] 2002, pet. ref'd). Evidence of the victim's physical, mental, or pecuniary injury is highly relevant when considering the full magnitude of the crime. *Id.* ("entirely appropriate" for jury to be asked to make reasonable deductions from evidence regarding degree of terror and pain experienced by complainant shortly before his death).

Thus, the prosecutor's argument concerning the injury suffered by Calhoun and his family was a reasonable deduction from the evidence. *See id.* The trial court did not err in overruling appellant's objections to these arguments. *See id.* To the extent the prosecutor urged the jury to speak for Calhoun's family, we conclude the trial court's instruction to disregard cured the error, if any, and said error was not "so prejudicial that expenditure of further time and expense would be wasteful and futile." *Hawkins*, 135 S.W.3d at 77. The trial court did not abuse its discretion in denying appellant's motion for mistrial. *See id.* We overrule appellant's seventh, eighth, and ninth points off error.

In his tenth point of error, appellant argues the judgment should be modified to reflect the correct names of the prosecutors. The State agrees. We are authorized to reform the judgment to make it "speak the truth" of the sentence imposed when we have the necessary data and information to do so. *Asberry v. State*, 813 S.W.2d 526, 529 (Tex. App.—Dallas 1991, pet. ref'd). Accordingly, we sustain appellant's tenth point of error and reform the judgment to reflect the correct names of the prosecutors.

As reformed, we affirm the trial court's judgment.


/David L. Bridges/
DAVID L. BRIDGES
JUSTICE


Do Not Publish
Tex. R. App. P. 47.2(b)

141419F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

TERRY RAY MCMILLAN, Appellant

No. 05-14-01419-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 265th Judicial District
Court, Dallas County, Texas
Trial Court Cause No. F-0550140-UR.
Opinion delivered by Justice Bridges.
Justices Lang-Miers and Schenck
participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED**
as follows:
>    under the heading, "Attorney for State:," "J Wilbanks" is deleted and "Rebecca
>    Dodds and Rick Jackson" are substituted.

As **REFORMED**, the judgment is **AFFIRMED**.

Judgment entered this 1st day of July, 2016.